# No. 13-70013

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**BRANDON BERNARD,**

# CONSOLIDATED WITH 13-70016

**CHRISTOPHER ANDRE VIALVA,**

**Defendants-Appellants.**

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

————————————

**CONSOLIDATED BRIEF FOR THE UNITED STATES OF AMERICA
IN OPPOSITIONTO APPLICATIONS
FOR CERTIFICATES OF APPEALABILITY**

————————————

> **ROBERT PITMAN**
> **United States Attorney**
>
> **Mark R. Stelmach**
> **Assistant United States Attorney**
> **Western District of Texas**
> **601 N.W. Loop 410, Suite 600**
> **San Antonio, Texas 78216**
> **(210) 384-7090**
> **ATTORNEYS FOR APPELLEE**

## RECOMMENDATION ON ORAL ARGUMENT

The United States of America suggests oral argument would not significantly aid the decisional process in this case. The issues raised on this appeal can be determined upon the briefs that adequately present the record and legal arguments relevant to this appeal.  *See* FED. R. APP. P. 34(a)(2)(C).

# **TABLE OF CONTENTS**

**Pages**

RECOMMENDATION ON ORAL ARGUMENT.................................................... ii

LIST OF AUTHORITIES.................................................................................iv

JURISDICTION................................................................................................1

STATEMENT OF THE ISSUES.......................................................................2

STATEMENT OF THE CASE..........................................................................2

    A.  Course of Proceedings and
           Disposition in the Court Below........................................................2
    B.  Statement of Facts.............................................................................5

SUMMARY OF THE ARGUMENTS ................................................................12

ARGUMENTS AND AUTHORITIES .............................................................15

Bernard's Issue A & Vialva's Issue 1..............................................................15
Bernard's Issue B .............................................................................................25
Bernard's Issue D.............................................................................................63
Bernard's Issue E .............................................................................................64
Bernard's Issue F .............................................................................................64
Vialva's Issue 2................................................................................................65
Vialva's Issue 3 & Bernard's Issue C..............................................................81
Vialva's Issue 4................................................................................................102
Vialva's Issue 5................................................................................................108
Vialva's Issue 6................................................................................................118
Vialva's Issue 7................................................................................................119

CONCLUSION ..................................................................................................122

CERTIFICATE OF SERVICE ..........................................................................122

CERTIFICATE OF COMPLIANCE..................................................................123

## TABLE OF AUTHORITIES

**Cases**                                                                **Pages**

*Brady v.Maryland*,
    373 U.S. 83 (1985)...................................................................................82

*Cuyler v. Sullivan*,
    446 U.S. 335 (1980)................................................................................72

*Harington v. Richter*,
    __ U.S. __, 131 S.Ct. 770 (2011) ...................................... 26-27, 106

*Kyles v. Whitley*,
    514 U.S. 419 (1995)................................................................................83

*Machibroda v. United States*,
    368 U.S. 487 (1962)................................................................................16

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003)................................................................................15

*Moore v. Illinois*,
    408 U.S. 786 (1972)................................................................................92

*Roper v. Simmons*,
    543 U.S. 551 (2005)......................................................................119, 120

*Stickland v. Washington*,
    466 U.S. 668 (1984)....................................................... 25-27, 73

*Strickler v. Green*,
    527 U.S. 263 (1999)..........................................................................82, 83

*United States v. Bagley*,
    473 U.S. 667 (1985)................................................................................82

*Wheat v. United States*,
486 U.S. 153 (1988)..............................................................................72

*Adanandus v. Johnson*,
947 F.Supp. 1021 (W.D. Tex. 1996),
*aff'd*, 114 F.3d 1181 (5th Cir. 1997) (unpublished).....................................78

*Allridge v. Scott*,
41 F.3d 213 (5th Cir. 1994) .......................................................................90

*Beets v. Scott*,
65 F.3d 1258 (5th Cir. 1999) (*en banc*).........................................................72

*Cargle v. Mullin*,
317 F.3d 1196 (10th Cir. 2003) ..................................................................62

*Derden v. McNeel*,
978 F.2d 1453 (5th Cir. 1992) (*en banc*)..............................................64, 118

*Dowthitt v. Johnson*,
230 F.3d 733 (5th Cir. 2000) .....................................................................60

*Doyle v. Stephens*,
2013 WL 3456782 (5th Cir. July 10, 2013) ...............................................120

*Felder v. Johnson*,
180 F.3d 206 (5th Cir. 1999) .....................................................................98

*Garcia v. Bunnell*,
33 F.3d 1193 (9th Cir. 1994) ............................................................... 73-76

*Gillard v. Scroggy*,
847 F.2d 1141 (5th Cir. 1988) ...................................................................31

*In re Garner*,
612 F.3d 533 (6th Cir. 2010) ...................................................................121

*Jackson v. Johnson*,
194 F.3d 641 (5th Cir. 1999) ......................................................... 90-91, 94

*Jasper v. Thaler*,
      466 Fed.Appx. 429 (5th Cir. 2012) (unpublished) ....................................120

*Lincecum v. Collins*,
      958 F.2d 1271 (5th Cir. 1992) .................................................................48

*Martinez v. Dretke*,
      404 F.3d 878 (5th Cir. 2005) ...................................................................51

*Moore v. Reynolds*,
      153 F.3d 1086 (10th Cir. 1998) ..............................................................110

*Moreland v. Scott*,
      175 F.3d 347 (5th Cir. 1999) ...................................................................62

*Murray v. Maggio*,
      736 F.2d 279 (5th Cir. 1984) ...................................................................39

*Patterson v. Cockrell*,
      69 Fed.Appx. 658 (5th Cir. 2003) ...........................................................45

*Pelton v. United States*,
      465 F.2d 952 (5th Cir. 1972) ...................................................................16

*Rutherford v. Crosby*,
      385 F.3d 1300 (11th Cir. 2004) ...............................................................60

*Spence v. Johnson*,
      80 F.3d 989 (5th Cir. 1996) .....................................................................90

*Tucker v. Johnson*,
      242 F.3d 617 (5th Cir. 2006) ..............................................................23, 24

*United States v. Autin*,
      632 F.2d 478 (5th Cir. 1980) ...................................................................16

*United States v. Bartholomew*,
      974 F.2d 39 (5th Cir. 1992) .....................................................................23

*United States v. Bernard*,
299 F.3d 467 (5th Cir. 2002) ...................................................... 58-59, 64, 117

*United States v. Bourgeois*,
2013 WL 3972699 (5th Cir. 2013) (unpublished).........................................23

*United States v. Brown*,
628 F.2d 471 (5th Cir. 1980) ........................................................................83

*United States v. Caro*,
597 F.3d 608 (4th Cir. 2010) ........................................................................83

*United States v. Cervantes*,
132 F.3d 1106 (5th Cir. 1998) ......................................................................16

*United States v. Chavez*,
193 F.3d 375 (5th Cir. 1999) ........................................................................16

*United States v. Edwards*,
442 F.3d 258 (5th Cir. 2006) ........................................................................84

*United States v. Hall*,
455 F.3d 508 (5th Cir. 2006) .......................................................... 15, 20-23

*United States v. Harris*,
408 F.3d 186 (5th Cir. 2005) ........................................................................39

*United States v. Horton*,
845 F.2d 1414 (7th Cir. 1988) ......................................................................76

*United States v. Hughes*,
230 F.3d 815 (5th Cir. 2000) ..................................................................82, 83

*United States v. Izydore*,
167 F.3d 213 (5th Cir. 1999) ........................................................................72

*United States v. Lee*,
274 F.3d 485 (8th Cir. 2001) ......................................................................115

*United States v. Ragsdale*,
    426 F.3d 765 (5th Cir. 2005) ......................................................................16

*United States v. Robinson*,
    367 F.3d 278 (5th Cir. 2004) ......................................................................64

*United States v. Runyan*,
    290 F.3d 223 (5th Cir. 2002) ......................................................................83

*United States v. Shaid*,
    937 F.2d 228 (5th Cir. 1991) ......................................................................66

*United States v. Sipe*,
    388 F.3d 471 (5th Cir. 2004) ......................................................................98

*United States v. Spence*,
    80 F.3d 989 (5th Cir. 1996) ......................................................................91

*United States v. Unruh*,
    855 F.2d 1363 (9th Cir. 1997) ............................................................... 78-79

*Walton v. Angelone*,
    321 F.3d 442 (4th Cir. 2003) ......................................................................61

*Williams v. Turner*,
    684 F.3d 597 (5th Cir. 2012) ......................................................................43

viii

# No.    13-70013

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT
_____

## UNITED STATES OF AMERICA,

### Plaintiff-Appellee,

### v.
## BRANDON BERNARD,

# CONSOLIDATED WITH 13-70016

## CHRISTOPHER ANDRE VIALVA,

### Defendants-Appellants.
_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

_____

## CONSOLIDATED BRIEF FOR THE UNITED STATES OF AMERICA

## <u>JURISDICTION</u>

This is an appeal from a final judgment of the district court in a criminal case denying 28 U.S.C. § 2255 relief in a death-penalty case.  The jurisdiction of this Court is invoked by Applicants pursuant to 28 U.S.C. §§ 1291 and 2253.  A Certificate of Appealability is sought pursuant to § 2253.

## STATEMENT OF THE ISSUES

### RAISED BY BOTH BERNARD AND VIALVA

A(B). & 1(V). Whether a COA should issue as to Applicants' assertions that the district court erred in not granting an evidentiary hearing as to 22 matters raised by Bernard and 12 matters raised by Vialva.

C(B). &. 3(V).  Whether a COA should issue as to the Applicants *Brady* claims that there was material information withheld by the prosecution.

### RAISED BY BERNARD

B(B). Whether a COA should issue as to Bernard's claim that his lawyers were constitutionally ineffective prior to and during the guilt phase, and prior to and during the penalty phase.

D(B). Whether a COA should issue as to the district court's denial of discovery.

E(B). Whether a COA should issue as to Bernard's claim that his conviction violated the Fifth Amendment.

F(B). Whether a COA should issue as to Bernard's claim that there was cumulative error.

2

**RAISED BY VIALVA**

2(V). Whether a COA should issue as to Vialva's claim that one of his attorneys had an actual conflict of interest that adversely impacted his lawyer's performance to the extent of *Strickland* prejudice; and whether, after a pre-trial hearing, Vialva effectively waived any conflict.

4(V).  Whether a COA should issue as to Vialva's claim that his lawyers were constitutionally ineffective prior to and during the guilt phase.

5(V). Whether a COA should issue as to Vialva's claim that his lawyers were constitutionally ineffective prior to and during the penalty phase.

6(V). Whether a COA should issue as to Vialva's claim that there was cumulative error.

7(V). Whether Vialva's execution will violate the Eighth Amendment.

## STATEMENT OF THE CASE

### A.  Course of Proceedings and Disposition in the Court Below.

After a jury trial, both Brandon Bernard ("Bernard") and Christopher Andre Vialva ("Vialva") were found guilty of the offenses alleged in the second superseding indictment:  Count One, murder committed during the course of a carjacking; Count Two, conspiracy to commit premeditated murder; Count Three,

3

premeditated murder of Todd A. Bagley on Fort Hood, a place within the special maritime and territorial jurisdiction of the United States; and Count Four, premeditated murder of Stacie L. Bagley on Fort Hood, a place within the special maritime and territorial jurisdiction of the United States (R(B). 1, 119-22; 2, 307-85, 386-88) (R(V), 4, 381-85; 5, 665-68, 875-77).[1]  The government had previously given notice of intent to seek the death penalty as to Counts One, Three and Four, which were then submitted to the jury for a determination of whether the death penalty was appropriate (R(B). 1, 124-34) (R(V). 4, 389-91).

In 2000, The jury determined that the aggravating factors identified outweighed any mitigating factors and sentenced both Defendants to death: Vialva on Counts One, Three and Four and Bernard on Count Four only. Their convictions and sentences were affirmed on appeal. *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002), *cert. denied*, 539 U.S. 928 (2003).

On June 14, 2004, Bernard filed his § 2255 motion (R(B). 3, 418-630; 4, 631-881; 5, 882-1125).  On the same day, Vialva filed his § 2255 motion (R(V). 7, 923-1189; 8, 1190-1430; 9, 1431-1629; 10, 1698-1931; 11, 1932-2041).

---

[1]  References to the Record on Appeal are designated by "R(B)." for Bernard's case and "R(V)." for Vialva's case, followed by the number of the record volume, and the pertinent page number(s).  References to the trial transcript are to Bernard's record.

The government filed it responses on December 8, 2004 (R(B). 7, 1392-1623) (R(V). 12, 2173-2395).

The district court denied § 2255 relief on September 28, 2012, and a Certificate of Appealability (R(B). 8, 95-157) (R(V). 1, 110-72).

On October 25, 2012, Bernard filed a Motion for Reconsideration or to Alter or Amend Judgment (R(B). 9, 163-78). The district court denied the motion on February 8, 2013 (R(B) 9, 388-92). Bernard filed a notice of appeal as to the denial of his § 2255 motion and his Motion for Reconsideration on March 28, 2013 (R(B). 9, 393-94).

On October 26, 2012, Vialva filed a Motion to Alter or Amend Judgment (R(V). 174-89), and a Motion for Reconsideration (R(V). 2, 190-206) . The district court denied the motion on February 8, 2013 (R(V). 2, 253-57). Vialva filed a notice of appeal as to the denial of his § 2255 motion and his other motions on April 8, 2013 (R(V). 2, 267-68).

## B.   Statement of Facts.

A more comprehensive statement of the facts is contained in the government's response to Bernard's section 2255 motion (R(B). 7, 1403-34).

As this Court summarized in *Bernard*, 299 F.3d at 471-73, on June 20, 1999, Vialva, Christopher Lewis, and Tony Sparks, "members of a gang in Killeen,

5

Texas," planned a robbery and carjacking: their plan was to "ask someone for a ride, get in the car and pull a gun on the victim, steal the victim's money and personal effects, obtain the pin number for the victim's ATM card, force the victim into the trunk of the car and drive somewhere to abandon the car with the victim locked in the trunk" (*id*. at 471).

The next day, Vialva, Lewis and Sparks "enlisted two fellow gang members," Bernard and Terry Brown, to assist in the plan (*id*.). Initially, the group only had one gun, a "tiny .22 pistol" that they considered "too small" to frighten a potential victim (*id*.). The gang members decided that a second gun was necessary (*id*). Bernard owned a Glock .40 caliber handgun that he had lent to Gregory Lynch (R(B). 19, 1872, 1874; 21, 2183). In a telephone call, in asking for the gun, Vialva stated to Lynch that he was on a "mission to make money" (R(B). 21, 2185). Vialva, Bernard, Lewis, Sparks and Brown drove to Lynch's house and obtained Bernard's gun (R(B). 21, 2186). "The group then set out in search of a victim" (*Bernard*, at 471).

Sometime after 2:00 p.m. on the afternoon of June 21, Bernard drove Vialva, Brown, Lewis and Sparks to a local supermarket in an unsuccessful effort to find a victim, and then they continued their search by driving around parking lots at other local stores (*id*.). At a convenience store in Killeen, they found Todd Bagley using a pay phone (*id*.).

"Todd Bagley and his wife, Stacie, were youth ministers from Iowa" who had returned to the area to visit family and friends, and to attend a revival meeting at a church where previously they had worked (*id*. at 471-72). On Sunday, June 21, after attending a morning worship service and having lunch with friends, Todd stopped at "Mickey's" convenience store to use the payphone, while Stacie waited for him in their car (*id*. at 472).

"Lewis and Sparks approached Todd and asked him for a ride to their uncle's house" (*id*.). It had been planned that Lewis would be the one to ask for a ride because he was younger in appearance (R(B). 19, 1887). Todd agreed to provide the ride (*Bernard*, at 472). Vialva, who was standing nearby, got in the backseat of the Bagleys' car with Lewis and Sparks; Todd was driving and Stacie was also in the front seat (*id*.). Bernard and Brown had gone to play video games; when they came out and could not find the other individuals, Brown assumed they had found a victim (R(B). 19, 1885).

Vialva gave Todd driving directions, and then pulled out the .40 caliber Glock, pointed it at Todd and told him that there had been "a change of plans" (R(B). 21, 2330).   At the same time, Sparks pointed the .22 handgun at Stacie (*id*. at 2331). Vialva ordered Todd to stop the car, and for the Bagleys to get out (*Bernard*, at 472). "The gang stole Todd's wallet, Stacie's purse and the Bagleys' jewelry" (*id*.). Vialva

7

demanded the PIN numbers for the Bagleys' ATM cards, and then forced the Bagleys into the trunk of their Buick automobile and locked them inside (*id*.).

Vialva drove around for several hours (*id*.). He went to ATM machines to withdraw money from the Bagleys' account (R(B). 20, 2120-21).   At one point, Vialva threatened to kill the Bagleys if the corrected PIN number they provided was not accurate (R(B). 21, 2338).   After $40 was withdrawn, the balance on the account was $2.60 (R(B). 20, 2120-21). Other unsuccessful attempts at withdrawing money were made (*id*. at 2155-56).

"Vialva drove to a 'Wendy's' where Lewis and Sparks used the Bagleys' money to purchase some food" (*Bernard*, at 472).   Vialva then attempted to pawn Stacie's wedding ring, rejecting an offer for it, and stopped at a store to purchase cigars and cigarettes (*id*.).

"While they were locked in the trunk, the Bagleys spoke with Lewis and Sparks through the rear panel of the car" (*id*.).   One of the speakers was apparently removed by Stacie to facilitate conversation (R(B). 19, 1742-43). "Lewis testified that the Bagleys asked them questions about God, Jesus and church" (*Bernard*, at 472).   The Bagleys discussed with Lewis and Sparks the revival meeting at Grace Christian, a church which Lewis said he had attended (*id*.). The Bagleys advised

8

Lewis and Sparks that God's blessings were available to anyone, and urged their captors to have faith (*id.*).

"After this conversation, Sparks told Vialva he no longer wanted to go through with the crime. Vialva, however, insisted on killing the Bagleys, and burning their car to eliminate the witnesses and the gangs' fingerprints" (*id.*). Vialva spoke of encountering law enforcement officers, and the discussion about a "shootout" got Sparks back "in the mood" (R(B). 21, 2352).

Vialva drove the Bagley's car to his house (*id.* at 2358). While he was inside, the Bagleys, while still in the trunk, had another conversation about God with Lewis and Sparks (*id.*). The Bagleys begged them to spare their lives (*id.*). The Bagleys said their captors could have their car and everything they had (*id.*).

Vialva returned to the car with a black and red ski mask and a shirt (*id.* at 2359). After visiting Lynch's house, Vialva stopped the car because the Bagleys were kicking the trunk trying to get out (*id.* at 2361). Vialva was angry at the Bagleys and told them, punctuated with an expletive, "I was about to let you out," but that now he would not (*id.* at 2362).

Vialva, Lewis and Sparks then met with Bernard and Brown, who had driven to meet them in Bernard's car (*id.* at 2363). "Vialva repeated that he had to kill the Bagleys because they had seen his face" (*Bernard*, at 472).

9

Bernard and Brown drove off to purchase fuel to burn the Bagleys's car (*id.*). Vialva had given Brown $10 to buy gasoline (R(B). 21, 2367-68). Brown and Bernard decided to purchase charcoal lighter fluid at Mickey's since they did not have "anything to put the gasoline in" (R(B). 19, 1906-07; 22, 2454). Brown gave the money to Bernard, who made the purchase (R(B). 19, 1908). Brown discussed Vialva's plan with Bernard as to what they were going to do with the car and the Bagleys (*id.*).

Vialva, Bernard, Lewis and Brown drove to an isolated spot, on a little side road, near the Belton Lake Recreation Area on the Fort Hood military reservation (*Bernard*, at 472). Vialva parked the Bagleys' Buick on top of a little hill (*id.*). "Brown and Bernard poured lighter fluid on the interior of the car while the Bagleys sang and prayed in the trunk" (*id.*). Brown warned Lewis not to say their names loud enough for the Bagleys to hear, but Vialva said that it did not matter; the Bagleys were "going to die" (R(B). 19, 1922).

Brown related that Stacie's last words were "Jesus loves you" and "Jesus, take care of us" (*id.* at 1936). "Vialva crudely cussed at her in reply" (*Bernard*, at 472) (R(B). 19, 1936). Vialva put on his ski mask, the trunk was opened, and "Vialva then shot Todd in the head with the .40 caliber gun, killing him instantly" (*id.* at 472-73). "Vialva shot Stacie in the right side of her face, knocking her unconscious, but not

killing her. Bernard set the car on fire" (*id*.). An autopsy later revealed soot in Stacie's throat and lungs indicating that she had inhaled smoke (R(B). 20, 2062). A toxicological examination of Stacie's blood revealed a high level of carbon monoxide, the product of breathing carbon monoxide gas from the burning car (*id*. at 2062-63).

After the gang members had assembled at Bernard's car, "[t]heir getaway was foiled when the car slid off the road into a muddy ditch" (*Bernard*, at 473).   Local law enforcement officers arrived at the scene while the assailants were trying to push the car out of the ditch (R(B). 18, 1624, 1650). A fireman who arrived on the scene of the burning car testified that he tried to "push the fire back toward the burnt part and try to save what was left" (*id*. at 1680). The car was almost totally destroyed except for the rear glass and the trunk area (*id*. at 1659).

Firemen discovered the bodies in the trunk of the Bagleys' burning car. Todd was literally melted into the car and the debris, and a stereo speaker had melted into Stacie's hand (R(B). 19, 1740-45). Two shell casings were found in the trunk.

The ski mask, recovered from Bernard's car, contained DNA; one in 67,000 people would match the DNA as did Vialva (R(B). 20, 1980, 1988, 1992).   Near the scene, two Kingsford charcoal lighter fluid cans were found (R(B). 20, 2006-08,

2036).   The .40 caliber Glock, and the .22 caliber pistol, also found in the vicinity, as well as the lighter fluid cans, contained no suitable fingerprints (*id*.).

## SUMMARY OF THE ARGUMENTS

## RAISED BY BOTH BERNARD AND VIALVA

A(B). & 1(V).   The district court did not abuse its discretion in declining to conduct a full evidentiary hearing as to issues raised in Defendants' section 2255 motions based on the district court's thorough analysis of Defendants' voluminous submissions.

C(B). &. 3(V).   The district court correctly determined that Applicants' *Brady* claims to be without merit based on the record. There is no indication of any evidence being withheld.   Nevertheless no materiality can be shown as to any possible additional information. Brown and Lewis acknowledged at trial that all of their prior statements were not only inconsistent, but contained many "lies." Brown testified that he would progressively admit only what the investigators discovered, and he agreed to whatever they proposed.   They only came forward with the facts of their testimony after they had made their "deals."   They were relentlessly cross-examined as to their prior "lies," and Defendants argued to the jury their lack of credibility.   Any other possible prior statements would have been

infected the same way.   The court was correct that cumulative information would not have been material.   A COA should be denied.

## RAISED BY BERNARD

B(B).   Bernard has not made a sufficient showing that his lawyers were constitutionally ineffective prior to and during the guilt phase, and prior to and during the penalty phase.   The district court did not abuse its discretion by declining to conduct an evidentiary hearing and denying the section 2255 ineffective assistance claims.   In a thorough and well-reasoned opinion, after analysis of the affidavits and voluminous record presented by the Defendants, the court correctly found that the claims were without merit and not adequate to proceed further. A COA should be denied.

D(B). Bernard's specific claim as to the denial of discovery relates again to the claim regarding statements in Brown's attorney's notes as potential additional impeachment evidence. As to Brown's statement about Bernard starting the fire by throwing a match, this statement not material because Brown stated at trial that he did not see Bernard start the fire and that his prior statements had been lies. As to prior criminal conduct, that too was cumulative of Brown's criminal gang conduct.

E(B). Bernard concedes as to this issue that his "arguments are foreclosed" and are raised to preserve them for later review.

13

F(B). There was no error and no cumulative error.

## RAISED BY VIALVA

2(V).   Vialva has not made a showing that one of his attorneys had an actual conflict of interest, based on his employment applications with the United States Attorney's Office.   This claim was procedurally defaulted and the required showing of cause and prejudice was not made.   Nevertheless, the claim is meritless. Vialva's position that there was a *per se* conflict has been rejected by many cases.   These cases hold that the mere fact of future employment plans does not create an actual conflict.   Nevertheless, after a pre-trial hearing, Vialva effectively waived any conflict.

4(V). & 5(V).   Vialva has not made a sufficient showing that his lawyers were constitutionally ineffective prior to and during the guilt phase, and prior to and during the penalty phase.   The district court did not abuse its discretion by declining to conduct an evidentiary hearing and denying the section 2255 ineffective assistance claims.

6(V). There was no error and no cumulative error.

7(V).   Vialva's claim, that his execution will violate the Eighth Amendment based on his age, 19, at the time of the murders, has been rejected.

14

## ARGUMENT AND AUTHORITIES

### A(B)., B1(B)., & 1(V). APPLICANTS HAVE NOT ESTABLISHED THAT THE DISTRICT COURT ERRED IN DENYING DICOVERY AND EVIDENTIARY HEARINGS AS TO CERTAIN SECTION 2255 CLAIMS

(Responsive To Bernard's COA Ground A and B1 12-18;
Vialva's COA Ground 1, 41-60)

#### COA And Section 2255 Standards

This Court will not consider an appeal from the denial of a 28 U.S.C. § 2255 motion for relief unless either the district court or this Court issues a Certificate of Appealability ("COA"). *United States v. Hall*, 455 F.3d 508, 513 (5th Cir. 2006) (citing 28 U.S.C. § 2253(c)(1)(B)). To obtain a COA, the applicant must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citation omitted). In making the decision whether to grant a COA, the court's examination is limited to a "threshold inquiry," which consists of "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.*   In reviewing a district court's denial of a motion to vacate sentence under § 2255, this Court reviews questions of

15

fact for clear error and questions of law *de novo*. *United States v. Chavez*, 193 F.3d 375, 378 (5th Cir. 1999).

As to a § 2255 claim, a district court shall grant a hearing "unless the motion and files and the records of the case conclusively show that the prisoner is entitled to no relief." *See* 28 U.S.C. § 2255(b). This Court reviews for abuse of discretion a district court's denial of an evidentiary hearing, which is granted only if the Appellants produce "independent indicia of the likely merit of [their] allegations." *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998). Mere conclusory allegations are not sufficient to support a request for an evidentiary hearing. *United States v. Auten*, 632 F.2d 478, 480 (5th Cir. 1980). As this Court explained in *Pelton v. United States*, 465 F.2d 952 (5th Cir. 1972), "While this section has often been held to require a hearing, it must not be implied that a movant must always be allowed to appear in a district court for a full hearing if the record does not conclusively and expressly belie his claim . . . [t]he language of the statute does not strip the district courts of all discretion to exercise their common sense." *Id*. at 953 (citing *Machibroda v. United States*, 368 U.S. 487, 495 (1962)). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Ragsdale*, 426 F.3d 765, 774 (5th Cir. 2005) (citation and internal quotation omitted).

Under Rule 6 of the Rules Governing Section 2255 Proceedings, "for good cause," the district court may authorize a party to conduct discovery.

**The COA Claims**

<u>Bernard's Hearing Claims</u>

In his motion for a COA, Bernard has selected a number of his section 2255 claims, and questions as to those claims, which he believes merited an evidentiary hearing. The first group of claims relate to whether counsel were constitutionally ineffective at the guilt stage of the trial:   as to the steps as taken in investigation, and the reason and consequences for ignoring other steps; as to counsels' lack of consultation with forensic experts including an arson expert and pathologist; as to possible reliance on preparation by Vialva's counsel; as to their strategy in attempting to avert authorization of this case as a death penalty case; as to interviewing witnesses, such as Brown and Lewis; as to whether they tried to get permission to interview Brown and Lewis from their counsel; as to the materials made available to them through discovery; as to the "nature and extent of co-defendant Browns mental illness"; and as to the strategy of the defense at the guilt phase (Bernard's Brief at 15-16).

Another group of claims relate to alleged *Brady* violations:   as to what the government knew about "Brown's mental illness," his medication, or his treatment;

17

as to what information the government possessed as to Brown's prior criminal conduct, Brown's use of illegal drugs, Brown's expectation of the benefit he would receive from cooperation, "and any other impeaching information"; as to whether government agents present at the proffers of Brown and Lewis took any notes or made other reports; and if agents did not take notes, the reason behind the agents' conduct (Brief at 16-17).

And, in the last group, the claims relate to whether counsel were constitutionally ineffective at the penalty stage of the trial:   as to the steps taken to investigate potential mitigating evidence; as to whether these steps were consistent with prevailing practice for capital cases; as to available mitigating evidence; as to the lack of an opening statement at the penalty phase; as to the conduct of the penalty phase and witness preparation; and as to the strategy at the penalty phase (Brief at 16-17).

Vialva's Hearing Claims

In his motion for a COA, Vialva also has selected a number of his section 2255 claims, and questions as to those claims, which he believes merited an evidentiary hearing:   whether counsel were constitutionally ineffective for failing to discover and argue in mitigation Vialva's "treatable bipolar disorder and organic brain impairment"; whether one of Vialva's attorneys, Dwight Goains, had a conflict

18

of interest that "caused him both to abdicate his role as lead counsel and fail in his duties of adequate preparation and advocacy"; whether, after a pre-trial hearing, Vialva knowing, intelligently, and voluntarily waived any potential conflict; whether there were *Brady* violations, as to prior statements of Brown and Lewis; as to whether the prior statements were part of the government's "open file" discovery policy; as to whether prior statements of Brown and Lewis were memoralized, where agents did not believe they were telling the truth, as to whether Brown's prior inconsistent statement of November 5 was disclosed, as to whether Brown's counsel's notes as to this debriefing were complete; as to whether the government failed to disclose relevant information concerning Brown's prior criminal acts; as to whether undisclosed promises were made by the government in exchange for his testimony; and as to whether counsel were constitutionally ineffective in the penalty stage as to steps taken to obtain expert services and investigate mitigating evidence; as to whether counsel's efforts were reasonable in light of prevailing standards; and whether any prejudice resulted (Vialva's Brief at 15-16).

The District Court's Determination

The district court considered Defendants' voluminous affidavits and submissions. The court denied an evidentiary hearing, finding that that many of the challenged actions fell within the categories of strategy and tactics or were otherwise

objectively reasonable, many of the claims were speculative and conclusory, and even assuming Defendants could have met the first *Strickland* prong, they could not show outcome changing prejudice as to the guilt phase or the penalty phase.

The district court did not err in denying evidentiary hearings. Applicants' hearing claims, listed above, will be discussed in the context of the section 2255 issues analyzed below.

Non-Necessity Of Evidentiary Hearing

Generally, the capital case of *Hall*, 455 F.3d 508, is instructive for purposes of the assertions of error as to a lack of a hearing as to section 2255 grounds. In *Hall*, the defendant made numerous section 2255 claims to the district court, which included: that there had been multiple instances of ineffective assistance of counsel; that there had been an extraneous influence on the jury[2]; that his indictment had been incomplete; that there had been prosecutorial misconduct by concealment of evidence and toleration of perjury; that there had been selective prosecution; and other claims. *Id.* at 520-24.

---

[2]  The extraneous influence claim was founded on contact by a juror with the victim's mother, based on letters allegedly written by the juror to Hall in prison at the conclusion of the trial, and the juror attending an event in which prayers were offered for Hall's victim. *Id.* at 521.

In *Hall*, the district court denied discovery motions and granted a hearing only as to the claim that there had been an extraneous influence on the jury. *Id.* at 512, 514. This Court held that no reasonable jurist could debate the district court's refusal to consider for evidentiary hearing the other grounds, including the ineffective assistance grounds. *Id* at 520.

One of Hall's ineffective assistance grounds, the "centerpiece" of his claims, was an alleged failure to conduct an objectively reasonable investigation into Hall's family background. During the penalty phase of Hall's trial, in support of the claim that he experienced an upbringing that militated against the imposition of the death penalty, Hall's counsel offered only the testimony of two of his family members, his mother and his sister. *Id.* at 516 and n.5. Additionally, this testimony indicated that Hall was not himself the object of his father's abuse and that, throughout his childhood, he attended school and church and was properly housed, fed, and clothed. *Id.*

In his section 2255 motion, however, Hall asserted that his upbringing was more difficult than what had been presented at trial in that he alleged he was beaten with belts and switches by both of his parents, but particularly his father, as a form of discipline, and he argued that his trial counsel's failure to present evidence of this alleged abuse occurred because of an inadequate investigation which substantially

prejudiced his defense at sentencing, constituting ineffective assistance of counsel. *Id.* at 516. In support of this argument, Hall submitted detailed declarations from family members and assorted experts. *Id.*

As to the ineffectiveness claim that Hall's trial counsel's investigation was unreasonable, the Fifth Circuit found that, although Hall's post-conviction experts had attacked some of the strategic and tactical decisions of counsel, no serious factual questions had been raised as to the reasonableness of the investigation. *Id.* at 517.[3]   Because counsel had performed a reasonable and substantial investigation, the Fifth Circuit determined that the district court's conclusion of no ineffective assistance, in the absence of a hearing on this subject, was correct. *Id.* at 519-20.

Additionally, this Court found no error with the district court's determination of no ineffective assistance of counsel, without a hearing on these subjects, as to claims that Hall's trial counsel was constitutionally ineffective for:  first, his trial counsel's failing to adequately prepare for and cross-examine Larry Nichols, a former cellmate of Hall's; second, his trial counsel's failing to obtain an opportunity for allocution for Hall; third, his trial counsel's failing to effectively argue several

---

[3]   This Court noted that there were affidavits that defense counsel was aware that Hall had received abuse by his parents, but the Court concluded that despite reasonable efforts to elicit that testimony from family witnesses, counsel was unsuccessful. *Id.* at 518-19. Nevertheless, the Court agreed with the district court that counsel had performed reasonably. *Id.*

motions for a continuance; fourth, his trial counsel's failing to effectively conduct voir dire; fifth, his trial counsel's failing to present an effective closing argument; and sixth, his trial counsel's failing to present adequate evidence of Hall's good conduct during his past incarceration. *Id.* at 520.[4]

The Court explained that "[t]hese arguments each essentially come down to a matter of degrees, and we have held in the past that these sorts of questions are even less susceptible to judicial second-guessing than most ineffective assistance of counsel arguments." *Id.* (citations, internal quotation marks, and brackets omitted).

In *United States v. Bartholomew*, 974 F.2d 39, 41-42 (5th Cir. 1992), this Court upheld the district court's denial of an evidentiary hearing on claims of ineffective assistance of counsel based on a failure to request a psychiatric examination, failure to pursue an insanity defense, failure to adequately investigate the crime, and other claims.  This Court determined that finding that the district court was not required to look outside of the record and documents based on ineffectiveness of counsel to make a determination as to the validity of the claims. *Id.*

---

4   *See also*, *United States v. Bourgeois*, 2013 WL 3972699 (5th Cir. Aug. 5, 2013) (unpublished) (as to the ineffective assistance claim of failing to present evidence concerning to the location of the fatal blows, this Court affirmed the denial of relief without a full hearing based on the court's receipt of deposition evidence).

23

In *Tucker v. Johnson*, 242 F.3d 617 (5th Cir. 2001), Tucker argued that his counsel should have put on a stronger case in mitigation of the death penalty. *Id.* at 622-23. This Court determined, however, "that although counsel could have presented additional mitigating evidence, the evidence before the jury illustrated the bleakness of Tucker's home life. Indeed, a reading of the cold trial record demonstrates Tucker was raised in an environment of rejection and neglect." *Id.* Although Tucker in his post-conviction submissions presented additional mitigating evidence, including evidence of physical and sexual abuse, the Fifth Circuit found that the evidence at trial adequately conveyed that Tucker's home life had been intolerable. *Id.* The Court made the further observation that the new evidence of Tucker's psychological damage could also have been aggravating instead of mitigating. *Id.*

<u>There Was No Abuse Of Discretion</u>

In this instant case as well, after reviewing the voluminous and detailed submissions by Defendants, the district court determined that the records conclusively showed no entitlement to relief and Defendants had failed to produce independent indicia of the likely merit of their claims. The court did not abuse its discretion in denying the claims without an evidentiary hearing.

24

**B2(B).   BERNARD FAILED TO ESTABLISH
HIS *STRICKLAND* CLAIM THAT HIS TRIAL COUNSEL
FAILED TO PROVIDE EFFECTIVE ASSISTANCE PRIOR TO
AND DURING THE GUILT PHASE**

(Responsive to Bernard's COA Ground B2, 22-34;
Also responsive to Vialva's Brief at 41-42).

**Standards Of Analysis And Review**

*Strickland*

Evaluation of whether counsel's performance is inadequate is based on the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Under this test, a defendant must establish both: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense so as to deprive him of a fair trial. *Id*.

To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." *Id*. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance.   *Id*. at 689.   The challenger's is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."   *Id*. at 687.

25

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. __, __, 130 S.Ct. 1473, 1485 (2010). *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 788 (2011) (quoting *Strickland*, 466 U.S. at 689-690). "Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Richter*, 131 S.Ct. at 788. "It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence." *Id*. at 778 (citations and internal quotation omitted). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690.

> With respect to the duty to investigate:
>
> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690–91.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. Unless a defendant shows that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. at 687. The likelihood of a different result must be "substantial," not just "conceivable." *Richter*, 131 S.Ct. at 687. As the Court explained in *Richter*:

> Although courts may not indulge "*post hoc* rationalization" for counsel's decisionmaking that contradicts the available evidence counsel's actions, . . . neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." . . . After an adverse verdict at trial even the most

27

experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

*Richter*, 131 S.Ct. at 790 (citations omitted).

Qualifications Of Bernard's Attorneys

The record shows that Bernard's first-chair attorney, Russell D. Hunt, had tried three cases "as first chair/primary attorney" in which the State of Texas had sought the death penalty (R(B). 4, 680).   He also prosecuted one death penalty case for the State of Texas (*id*.).   Additionally, he had tried several state murder cases in which the State waived or did not seek the death penalty (*id*.).

Bernard's second-chair attorney was Hunt's son, Russell D. Hunt, Jr. (*id*. at 683).   Attorney Hunt, Jr., had tried over two dozen state felony cases and had assisted his father in two capital cases in which the State of Texas sought the death penalty (*id*.).

**Failure To Persuade The Government
Not To Seek The Death Penalty**

Bernard first argues under this section that a COA should issue as to his claim that his trial counsel was constitutionally ineffective for failing to pursue "an early and thorough investigation aimed at developing information to persuade the

Government not to seek Bernard's execution" (Brief at 22). He also claims outcome changing prejudice as to this issue (Brief at 26).

On August 17, 1999, the prosecutor, Mark Frazier, sent a letter to Bernard's attorney, Russell D. Hunt, in which the prosecutor stated that it was his intention "to recommend to the United States Attorney that the death penalty be sought, based on the facts at hand," but that counsel was being provided the opportunity to present "any reasons why the death penalty should not be sought" (R(B). 4, 644). On August 30, 1999, Attorney Hunt sent a letter to the prosecutor outlining the basis for opposition to the death penalty and asserting:   the evidence will show that "Bernard was not the instigator of this action, nor was he the leader," as Vialva was the instigator and leader; the evidence will show that Bernard "tried to persuade Vialva to release the victims unharmed," and "Bernard believed Vialva would release the victims until the moment that Vialva shot them both"; that Bernard was not a leader and had been characterized by his former high school principal as a "non entity," "never at the front of anything," and "almost defined by the group he is with"; that he had a list of "at least eighty people who will be willing to come to court and testify that Mr. Bernard is not violent and would not initiate an incident such as this"; and that Bernard was ready to enter a plea and testify against Vialva (R(B). 4,

642-43). Counsel offered to provide additional information "in determining a future direction" (*id*.).

In his brief, Bernard argues that Bernard's counsel was ineffective for being "almost completely silent about Bernard's diminished culpability or why a death sentence was inappropriate" (Brief at 22). He also believes additional counsel should have been sought at this stage. These claims are without merit. As shown above, the arguments for Bernard's diminished culpability and for not seeking the death penalty were cogently set forth. Bernard's counsel made the best offer possible under the circumstances: to show that he was a mere follower and to cooperate and testify against Vilava. The district court found that: "The guilt of the Defendants was so obvious, and the facts of the case so heinous, there can be no doubt that the death penalty would have been authorized for Bernard regardless of what additional counsel could have brought to the case" (R(B). 8, 111-12). The court further found: "Bernard presents nothing to establish that a longer or more detailed response [by "Hunt Sr."] would have been any more effective" (*id*). Bernard has not made a viable COA claim of deficient performance or of outcome-changing prejudice.

**No Opening Statement**

Next, Bernard complains that his counsel was ineffective at the trial stage by failing to make an opening statement (Brief at 23).   The district court ruled that this claim was without merit.   The court cited *Gillard v. Scroggy*, 847 F.2d 1141, 1147 (5th Cir. 1988), which explained that the decision not to make an opening statement "is the essence of a strategic choice" (R(B). 8, 139-40).   In his application for a COA on this issue, Bernard argues that inconsistencies in the statements of Brown and Lewis should have been highlighted in an opening statement.   However, as discussed below, Brown and Lewis were comprehensively cross-examined as to inconsistencies and contradictions in their prior statements. Inconsistent statements and contradictions in the testimony of Brown and Lewis were again extensively highlighted for the jury in closing arguments. Thus, as to the no-opening-statement claim, Bernard has not made a viable claim of deficient performance or of outcome-changing prejudice or of a claim worthy of a COA.

**Inadequate Cross-Examination Of Brown And Lewis At Guilt Phase**

Bernard's COA Claim

Bernard also argues that inconsistencies in the statements of Brown and Lewis should have been highlighted in cross-examination (Bernard's Brief at 23). Bernard postulates outcome changing prejudice based on "inadequate impeachment (Brief at 27). However, as discussed in more detail in the government's 2255 response (R(B). 7, 1435-1525), Brown and Lewis were comprehensively cross-examined as to inconsistencies and contradictions in their prior statements.

Vialva's COA Claim

Vialva also attacks his counsel for failure "to develop available impeachment of Christopher Lewis and Terry Brown" (Vialva's Brief at 41-42). This claim is without merit for the same reasons.

Vialva's Counsel's Cross-Examination Of Brown

First to cross-examine Brown was one of Vialva's attorneys, Mr. Goains (R(B). 19, 1936). After making various points, including Brown's motivation to testify and other matters, counsel began to examine inconsistencies and contradictions in Brown's prior statements (*id* at 1938-40). After defense counsel asked Brown: "And in each of these statements, you changed your statements,

32

didn't you?" (*id.*). Brown responded that in each statement he was just "being more specific" (*id.*).

Defense counsel replied (*id.* at 1938-39):  "Okay. We're going to go through those in just a minute.  But my question to you, isn't it true that each of those statements are dramatically different?"  Brown responded "No, sir" (*id.* at 1939). Defense counsel then produced Defendant's Exhibit 5, Brown's statement at the Army's CID office (*id.*). Counsel read portions from this statement, and asked: "That's not even close to the information you just gave this jury, correct?" (*id.*). Brown responded that he made this statement "before the deal was even approached" (*id.* at 1939-40). Defense counsel focused on further inconsistencies. Initially, in this statement, Brown denied knowing:  who set the car on the hill on fire; how the vehicle found to be on fire had arrived at that spot; and who killed the people found in the trunk of the vehicle burned (*id.* at 1941).  Defense counsel made the point:  "[That is a] little different statement that you just gave to the jury, wouldn't you agree with me?" (*id.*).  Brown replied (*id.*):

> Yes.  And like I noted, that was way before any of this had came into action, before the deal was offered.  And like I said, that was before that they even knew that we had did the crime.

Brown testified that he did not make his "deal" with the government until "a few months" after his arrest (*id*. at 1942).

Defense counsel then turned to another voluntary statement given by Brown "a little bit later," at 12:30 on June 22 (*id*. at 1941-42, 1944; Def.Ex. 6). Counsel first reviewed a portion of Brown's direct testimony (*id*. at 1942-43). In a long exchange, counsel highlighted the differences between Brown's prior statement and Brown's testimony regarding where he was standing when the shots were fired and his view of the Bagleys' position in the trunk (*id*. at 1941-44).

Counsel reminded Brown as to his prior statement that Bernard had been in the car when Brown arrived (*id*. at 1944). Brown was confronted by his inconsistent prior statement as to where he was situated when the shots were fired (*id*.). Counsel also highlighted additional contradictions between Brown's prior statements and his trial testimony regarding where the carjacking took place (*id*. at 1945).

Brown was confronted of statements he made to friends that "Little Chris," meaning Chris Lewis, "had pulled a gun on the man and woman" (*id*. at 1946). Brown denied making that statement (*id*.).

34

Bernard's Counsel's Cross-Examination Of Brown

One of Bernard's attorneys, Mr. Russell D. Hunt, Jr., next cross-examined Brown (*id*. at 1948).   Bernard's counsel reminded Brown that he had testified that merely because someone is a member of a gang does not mean that he will join with another gang member to commit a crime (*id*. at 1949). Brown agreed with defense counsel that being a member of a gang can be "kind of like a neighborhood thing" with the "kids in the neighborhood," and that there are lots of different neighborhood gangs, and different neighborhood "Bloods" gangs (*id*. at 1950).   Counsel clarified that Bernard's specific Bloods sub-group was the "Four-Fifteen tree top" (*id*).

Bernard's counsel elicited that Brown and Bernard had engaged in a discussion in which they expressed doubt as to whether anyone was really going to be "jacked" or robbed (*id*. at 1952).

Bernard's counsel asked questions focusing on the fact that while the others were "out running around," Brown and Bernard were filling out applications for a job at the Winn-Dixie store because they both really "wanted to get jobs" (*id*. at 1953).

Counsel again brought out that while Brown was in the park and Vialva said he was going to have to kill the people, Brown "doubted" Vialva "was actually going to do that" (*id.* at 1954). Counsel then focused on what Brown had told Bernard regarding his intentions toward the Bagleys (*id.* at 1955). Counsel asked Brown whether after he got into Bernard's car, and told him of the plan, Brown said that they were going to go out in the countryside and shoot these people, and Brown responded "No sir" (*id.*).

Counsel then recounted Brown's direct testimony that Brown put lighter fluid in the back seat and Bernard put lighter fluid in the front seat (*id.*). Brown conceded that he poured lighter fluid in the trunk (*id.*). Finally, Bernard's counsel focused on the benefits Brown received from his plea agreement and his motivation for cooperation (*id.* at 1957-59).

<u>Vialva's Counsel's Cross-Examination Of Lewis</u>

In cross-examining Lewis, Vialva's counsel, after making a number of other points, reviewed Lewis' prior inconsistent statements as to where he was and what he was doing on the morning of June 21, 1999 (R(B), 21, (2397) ("that's not what you put in your statement"). Lewis could not remember the approximate time of events, and counsel chided Lewis for providing details on direct examination but claiming not to remember times on cross (*id.* at 2399). Counsel pointed out new

details in Lewis' testimony that were not in his statement (*id.*) ("that's not in your statement either, is it, Mr. Lewis?"). Counsel highlighted further details about the trips to the Mickeys store and the IGA which also had been omitted from his statement (after giving Lewis time to examine his statement) (*id.* at 2399-2400). Counsel emphasized more of Lewis' omissions from his statement as to who pulled out the two guns, what items were taken from the Bagleys and how they were disposed (*id.* at 2400-01).

### Bernard's Counsel's Cross-Examination Of Lewis

In his cross-examination of Lewis, Bernard's counsel explained that he was going to jump around because of the questions already asked by Mr. Goains (*id.* at 2418). Counsel referenced the series of questions asked by Vialva's counsel regarding Lewis' June 22nd statement, made on the day after the shooting (*id.*). Counsel then reviewed other "lies" told by Lewis: Lewis' assertion in his written statement, that Vialva said that he was stopping for lighter fluid to have a barbecue, also was a "lie" (*id.* at 2419); Lewis' assertion in his statement, that when Vialva pulled up the dirt road to go up the hill, he said he was going to "his cousin's house" also was a "lie" (*id.*); Lewis' assertion in his statement that at the shooting Vialva "called us all scared," or accused them of being cowards also was a lie (*id.* at 2420-21). Lewis' assertion in his statement "Chris popped the trunk open" also

37

was a "lie" (*id*.) (as his testimony was that he did not know who opened the trunk); Lewis' assertion in his statement that Vialva shot Mr. Bagley in the center of his forehead, and that he saw the woman shot in the side of her head were not true because during the shootings he was walking down the hill, and that he had not seen the locations of the shots, testifying that "[i]t was a lie, sir" (*id*. at 2421-22). Bernard's counsel emphasized that "[t]he truth is . . . you lied about a number of different things" (*id*. at 2422).   Lewis agreed (*id*.).

Jury Arguments As To The Testimony
Of Brown And Lewis

A few examples from Bernard's counsel's closing argument relating the testimony of Brown and Lewis were:   there was no physical evidence tying Bernard to the crime (R(B). 23, 2640); the government's case was built only on the testimony of Brown and Lewis; Brown and Lewis were kept together and were able to "dovetail their stories" (*id*.); many of the lies told by Brown and Lewis had been just pointed out by Vialva's counsel in the previous closing argument (*id*. at 2641); and Lewis was a "liar" and "He's admitted he's a liar" (*id*. at 2643).

<u>There Was No Ineffective Assistance</u>
<u>As To Cross-Examination</u>

As shown above, Brown and Lewis were relentlessly cross-examined by defense counsel. Vialva's counsel, in questioning first, highlighted the majority of the inconsistent prior statements by Brown. Bernard's counsel highlighted many of the inconsistencies in the Lewis' prior statement. To the extent Bernard is arguing that his counsel should have reiterated the same inconsistencies previously covered, that claim has been rejected. *See United States v. Harris*, 408 F.3d 186, 191 (5th Cir. 2005) ("This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel" (citing *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984))).

As shown above, Brown and Lewis painstakingly acknowledged that their prior statements were "lies," and that they only revealed the information in their trial testimony after they had made their "deals." They could not have been more effectively impeached with prior inconsistent statements.

The district court determined that there was "no basis" for Bernard's claim regarding ineffectual cross-examination of Brown (R(B). 8, 142). Further, the court found that "counsel for both Vialva and Bernard rigorously cross-examined Lewis" and there was no basis for a claim of ineffective assistance in this regard (*id*.

at 143).  The court was correct. Again, Bernard has not made a viable claim of deficient performance or of outcome-changing prejudice or of a claim worthy of a COA.

**Failure To Consult Independent Experts At Guilt Phase**

Bernard's COA Claim

The next claim for which he seeks a COA is Bernard's contention that his counsel was ineffective at the guilt stage for failing to challenge forensic evidence regarding where the fire originated in the Bagleys' car, and whether the fire had any role in Mrs. Bagley's death (Brief at 24), and that the result was *Strickland* prejudice (Brief at 26, 28).

The District Court's Resolution

In his section 2255 motion, Bernard raised a large set of contentions as to "Who Set the Fire?" and "How the Fire Was Set," (R(B). 6, 1233-35), as well as ineffective assistance allegations as to the lack of acquisition of forensic evidence. In its Order, the district court explained that when a defendant alleges a failure to investigate he "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial" (R(B). 8, 134) (quoting *Druery*, 647 F.3d at 541) (further quotation omitted).  The court noted that in this case there was "little scientific evidence linking the defendants to the scene of

the murder[s]" (*id*. at 134-35), and the Defendants had the advantage of making this argument before the jury (*id*.). The court further noted *Richter's* admonitions that "[a]n attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense," and "it is sometimes better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates" (*id*. at 134-36, 144). The court correctly found no deficient performance and no prejudice.

The Evidence

*Where The Fire Was Started*

Brown testified that: Brown and Bernard together applied the charcoal lighter fluid to the back seat and the back of the car by the rear window (R(B) 19, 1919-20); Bernard applied lighter fluid to the driver's seat and the front passenger seat (*id*.); and Brown applied lighter fluid on the outside of the trunk (*id*. at 1922).

An arson investigator determined through his investigation, that, as to the burned vehicle: someone had poured accelerant on the hood of the vehicle (R(B). 20, 2082); the flammable liquid was poured on the top of the trunk lid as well (*id*. at 2082); the expert indicated that an area in the interior of the vehicle, including the rear of the driver's seat, was the "possible" point of origin of the fire (*id*. at 2085) (the fire "could conceivably start on the inside of the vehicle"); the fire here burned

41

the longest and with the most amount of damage (*id.*) (although, in an incendiary fire, "[i]t's not always so" that the area with the longest burning and most damage is the point of origin); and it was "possible" someone could light the fire by standing on the side of the vehicle and tossing a match to light the material (*id.* at 2086). After the fire was lit by a match or "however it's been lit," because the windows were up, the fire was going to be delayed somewhat because of a lack of ventilation (*id.* at 2094-95).

### Role Of The Fire In Stacie Bagley's Death

Dr. Joni McClain, performed the autopsy upon Stacie Bagley (R(B). 20, 2056). Her testimony was that:   Stacie died of a gunshot wound to the head, smoke inhalation and thermal injury (*id.* at 2057); Stacie was shot in the face, on the right side, just below her nose (*id.*); there was no exit wound for the bullet, and the damage to Stacie's brain did not kill her right away (*id.* at 2061); an examination of Stacie's throat and lungs indicated that she inhaled smoky sooty material (*id.* at 2062); a toxicological examination of her blood revealed a carbon monoxide level of 45%, which indicated that the inhalation of the smoke contributed to her death (*id.*); and she also had severe thermal injuries (*id.* at 2063).[5]

---

5    In contrast, the autopsy of Todd Bagley showed that:   he had been shot in the left side of his forehead; with the type of brain damage he received, he likely was unconscious immediately; and he died very quickly (R(B). 20, 2039-43).

<u>There Was No Ineffective Assistance</u>

Bernard's postulation that an arson expert would have been of any assistance is purely speculative.   As shown above, the expert testimony was that lighter fluid was placed all over both the interior and exterior of the vehicle, including the trunk. The burn pattern was consistent with burning towards the trunk.   The expert opined that it was "possible" someone could light the fire by standing on the side of the vehicle and tossing a match to light the material (*id.* at 2086).   Bernard's section 2255 expert offering that the origin of the fire could not be determined with certainty is not inconsistent with the evidence at trial and did not constitute a basis for ineffective assistance or outcome changing prejudice.[6]   As it was, defense counsel had plenty of latitude to make an argument for reasonable doubt as to where the fire started and who set the fire.   Bernard's problem was not in the expert testimony, but in the testimony of Brown and Lewis (particularly of Brown who was the only witness to position Bernard near the vehicle). In closing argument, as discussed above, Bernard's counsel vociferously challenged that testimony.

Additionally, a few examples from Bernard's counsel's closing argument relating to the car fire and reasonable doubt as to Bernard's guilt were: Lewis

---

6  *See Williams v. Turner*, 684 F.3d 597, 604-05 (5th Cir. 2012) ("But the fact that new evidence would have given [the defendant] a stronger defense or that the case would have been argued differently does not necessarily mean that the outcome would have been different").

initially stated to authorities that "Vialva bought the lighter fluid" (*id*. at 2643); initially "[e]verything was laid off on Vialva" (*id*).; Brown's testimony was inconsistent, first saying that there was a definite plan and then saying he just figured out the plan (*id*. at 2644); there was no plan to kill (*id*. at 2646); "[t]hink about the lies that were told by Terry Brown" (*id*.); there was no evidence that Bernard purchased the lighter fluid except from Brown and Lewis (*id*. at 2648-49); only Brown and Lewis said Bernard even knew the Bagleys were in the trunk (*id*. at 2649); neither Brown nor Lewis testified that they saw who lit the fire (*id*. at 2649-50); only Brown said that Bernard was in position next to the car (*id*. at 2650), but neither Brown nor Lewis had been credible (*id*. at 2650-51). An arson expert would not have helped Bernard's defense.

Bernard's speculation that another medical expert would have been of assistance is also flawed. As discussed above, there was solid medical evidence, recited by this court in the *Bernard* opinion, that the damage to Stacie's brain did not kill her right away: her throat and lungs indicated that she inhaled smoky sooty material, and the carbon monoxide level in her blood indicated that the inhalation of the smoke contributed to her death. Bernard points to trial testimony of Vialva's expert who opined that after a gunshot wound to the head, like the one Stacie received, a person could "die very, very quickly," or they could live 30 minutes or

more (R(B). 22, 2557-58).    Bernard cannot show that the length of her life or her level of consciousness at any point in time could be determined with precision.    A defense pathology expert for Bernard would not have been of assistance, as he was able to argue that she could have died "very, very quickly." Such an expert also likely would have reiterated negative evidence.    Bernard's counsel put the best light on the situation by attempting to cast doubt on the testimony of Brown and Lewis as to:  whether Bernard knew of a plan; whether he knew anyone was in the trunk; whether he purchased any lighter fluid; and whether he lit the fire.

Bernard failed to allege how additional investigation or expert testimony would have altered the outcome of the trial.    Bernard's counsel was not required to pursue an investigation that would be fruitless, much less one that might be harmful to the defense.[7]    The district court was correct in finding no deficient performance and no prejudice based on the circumstances and the substantial evidence against Bernard.

---

7  *See*, *e.g.*, *Patterson v. Cockrell*, 69 Fed.Appx. 658, *13 (5th Cir. 2003) (unpublished) ("A trial counsel's reasoned decision not to introduce evidence, containing both helpful and damaging information, cannot be deficient performance") (citations omitted)).

## B3(B).   BERNARD FAILED TO ESTABLISH HIS *STRICKLAND* CLAIM THAT HIS TRIAL COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE PRIOR TO AND DURING THE PUNISHMENT PHASE

(Responsive to Bernard's Brief in Support of COA, Issue B3, 34-70)

**Failure To Conduct Thorough Mitigation Investigation At Penalty Phase**

Bernard's COA Claim

The next claim for which he seeks a COA is Bernard's contention that his counsel were ineffective at the penalty stage for failing to conduct a thorough mitigation investigation to uncover much meaningful information about Bernard, and failing to appreciate the significance of important facts that sources disclosed (Brief at 34-38).

Bernard's Penalty Presentation

Bernard's attorneys presented their mitigation case after Vialva's attorneys. A summary of Bernard's counsel's presentation at the penalty phase is located within the government's response to Bernard's 2255 motion (R(B). 7, 1544-47).

Claimed Deficiencies

Bernard claims that his counsel were constitutionally ineffective because: the service used by his attorneys, Criterion Investigations, a private investigation agency, was inadequate in its mitigation investigation by not conducting a thorough

46

inquiry; counsel was deficient in securing mental health expertise; counsel failed to prepare to challenge the government's aggravating evidence; and these deficiencies contributed to ineffective assistance in the conduct of the sentencing hearing (Brief at 34-38).

The District Court's Resolution

The district court found that "counsel for Vialva and Bernard took separate paths during the punishment phase" (R(B). 8, 144). Vialva's lawyers chose to portray Vialva as a "broken vessel" which was: the product of an abusive home, and having Attention Deficit Disorder (*id.*). Bernard's counsel, instead, portrayed Bernard as basically a good person, a follower who was led astray, but who continued to retain some decency; and someone who could be rehabilitated (*id.*). The district court determined that this was a strategic choice and was not subject to an ineffective assistance claim.

The Investigation And Guilt-Phase Presentation

Bernard claims that counsel should have hired an investigating agency with more experience in developing mitigation evidence (Brief at 34-38). He argues outcome changing prejudice based on this argument (Brief at 50-51).

Bernard claims that the contacts provided by Bernard's mother were insufficient in providing leads. Thus, Bernard argues witnesses and records were

not developed which included:    the breakdown of his parents' marriage, triggering his depression and social isolation; the damaging influence of a cousin; the lack of input from his father, family members, neighbors, teachers, clergy, and correctional officers; the positive aspects of his personality; his trustworthiness as a caretaker for young children; and his determination to educate himself and get his GED (*id*.).

As the district court observed, many of the claimed omissions were, in fact, covered at the punishment phase.[8] Bernard's mother discussed her divorce in 1992, her open-heart surgery, and Bernard's move to his father's residence (R(B). 25, 3151-52).

As the district court noted, there had been a violent confrontation between Bernard and his father (R(B). 8, 145-46).    Bernard stopped going to school while living with his father (R(B). 25, 3151). This would not have furthered or been in accord with counsels' mitigation theory.

A leader of Bernard's former church group, Milton Rios, was one of the witnesses who testified (R(B). 25, 3145).    Rios believed that Bernard was a "good kid" (*id*.).    Another witness affiliated with the church, Jimmy Olatre, thought that Bernard was "just a normal kid" with "a smiling face" (*id*. at 3131).    A number of Bernard's neighbors testified.

---

8    *See Lincecum v. Collins*, 958 F.2d 1271, 1280 (5th Cir. 1992) (highlighting that duplicative testimony could not have had an effect on the jury's decision to access the death penalty).

Matthew Mitchell, Bernard's friend, testified that Bernard was "just a kind guy" (R(B). 28, 2876).   Bernard was 'the type of guy you could fall in love with"; he was "real funny" (*id.*).

In an effort to humanize Bernard, and highlight his good personality qualities, Sherise Scott, Bernard's girlfriend of five years was called as a witness (R(B). 25, 3139). She testified that he was "nice," "always helpful," "respectful," and he always made her "feel better" (*id.* at 3140). She liked his sense of humor (*id.*). She said she had never seen him "hurt" anybody (*id.*).   She believed he would not intentionally hurt anybody (*id.*).

Bernard's counsel's sequence of witnesses echoed the theme that Bernard was not dangerous because he was not a leader:   Rorie-Cody, mother of Bernard's friend, said she "never figured him as a leader" (*id.* at 3126); Mitchell testified that Bernard was a "follower' (R(B). 28, 2876); Scott, Bernard's girlfriend, thought he was "too nice" in succumbing to anyone's request for a ride (R(B). 25, 3141); and Bernard's mother declared he "has always been a follower" (*id.* at 3152).

Bernard's mother testified that Bernard obtained his GED, and then went back to high school also to try to get his diploma (*id.* at 3152).   She said that Bernard had the goal of going to college (*id.*).

Bernard's ineffective assistance claim as to the mitigation investigation is without merit. Bernard's mother was a lieutenant colonel in the United States Army Reserves; she was competent to direct the agency to potential witnesses. The agency developed information that became the foundation for counsel's argument that Bernard was basically a good person, someone who had tried to overcome the hurdles and challenges in his life, a follower who was led astray but who continued to retain some decency, and who could be rehabilitated.   As the district court found (R(B). 8, 145):

> During the punishment phase, Bernard's counsel presented several witnesses who testified that Bernard was a nice young man, had attended church, was respectful and kind, and was not a leader. Bernard's mother also testified about his background, with both her and her husband active duty military when Bernard was born.  Bernard was sent to church school through the eighth grade, when he transferred to public school in Killeen.  After getting into trouble, he went to live with his father.  She further testified that she tried to instill Christian principles in Bernard, and that he should be punished for his crimes but not executed.

In his section 2255 presentation, Bernard offered expert Jill Miller's social history investigation as an example of what should have occurred in the mitigation investigation (R(B). 8, 145-46).  The district court found, however, that "[t]he testimony of the witnesses identified by Miller are merely cumulative of the testimony which was offered at trial" (*id*.).   The court concluded that "[t]he

decision not to present such cumulative testimony does not constitute ineffective assistance of counsel (*id.* (citing *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007)) ("Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative") (internal quotation omitted)).

Bernard also claims that his attorneys performed deficiently in securing mental health expertise (Brief at 38-39), and that, based on this claim, there was a reasonable probability of a different result (Brief at 57-58). Bernard's attorneys engaged the services of psychologist Dr. James Shindler to perform a psychological evaluation (R(B). 5, 920). Bernard asserts other mental experts could have been retained and testified as to his experiencing several head traumas, and that he regularly smoked marijuana dipped in formaldehyde or embalming fluid (*id*). According to petitioner's motion, a different evaluation would have revealed that Bernard had a "mild neurocognitive dysfunction" resulting in a difficulty with more complicated detail-oriented tasks (R(B). 6, 1289-90).

In *Martinez v. Dretke*, 404 F.3d 878, 888 (5th Cir. 2005), this Court found no *Strickland* ineffective assistance in the determination that counsel in capital case was not deficient in failing to present insanity defense during guilt phase or argue insanity or neurological defects in mitigation, notwithstanding petitioner's

commitment to a mental institution 20 years earlier, where several psychological evaluations determined that petitioner did not suffer from any gross psychiatric disorders; counsel investigated, developed and presented other mitigating evidence, which counsel determined was more viable and less potentially fraudulent than insanity and less potentially harmful on the issue of future dangerousness than organic brain damage.

In the instant case, a presentation of Bernard as having a "mild" mental impairment or neurocognitive dysfunction, was not congruent with the more viable approach selected by trial counsel of Bernard being basically a good young man being led astray. As the district court found, "[t]he presentation of such a witness could have lessened the impact of the positive approach counsel adopted by taking away from the impact of the attempt to 'humanize' Bernard for the jury" (R(B). 8, 148). This approach was less potentially dangerous on the issue of future dangerousness than organic brain damage. Further, presenting Bernard as having only a mild impairment as to detail-oriented tasks is not something reasonably likely to have been more effective than the approach taken by Bernard's attorneys, who were experienced in capital litigation. Similarly, as to drug use, again, this aspect was not congruent with counsel's presentation of Bernard being a good kid, and not dangerous.

**Failure To Prepare To Challenge, And To Successfully Challenge
The Government's Aggravating Evidence**

Bernard's COA Claim

Next, Bernard claims that his attorneys performed deficiently in failing to anticipate and prepare to respond to the factor of future dangerousness based on "his purported membership in the infamous 'Bloods' street gang" (Brief at 40-43). Bernard argues that counsel should have prepared to present evidence as to the weakness of Bernard's ties to this national gang (*id*.), and that this evidence would have been outcome changing at the penalty phase (Brief at 63-66).

The Government's Penalty Phase Presentation
As To Bernard's Criminal History & Gang Affiliation

At the penalty phase, the government introduced evidence that Bernard: committed the burglary of an Army surplus store (R(B). 24, 2729-30) (referred to the County Attorney's office and juvenile probation); committed several burglaries with his cousin (who was the same age as Bernard) (*id*. at 2730, 2732); was involved in burglaries of habitations, and he used stolen cards to obtain money (*id*. at 2759-60, 2765). Bernard was apprehended after committing the burglary of a habitation, in which he threw a rock through the door at 4:00 a.m., an officer yelled for him to stop, but he kept running; he also possessed jewelry and a small pry bar; the stolen items were related to another, earlier, burglary (*id*. at 2739-42).

53

On May 24, 1999, Bernard, in collusion with Terry Brown, was involved in two burglaries (*id*. at 2765).   Terry Brown also testified that, working with fellow gang members, Bernard and Vialva, they committed approximately 25 burglaries starting in April of 1999 (*id*. at 2787).   Brown explained that they would ride around, knock on a door, and if no one answered, "we'd kick in the door" (*id*. at 2788).   Vialva named the three the "Kick-Door Boys" (*id*. at 2793).

During one burglary, Brown found a 9 millimeter handgun (*id*. at 2794). Brown gave the gun to Bernard (*id*.).   Bernard traded this gun for the .40 caliber Glock that was the weapon used to kill the Bagleys (*id*.).

One officer, a specialist in the area of gangs, testified that Bernard had "ACK" engraved in gold on his teeth (*id*. at 2807-08).   The officer explained that "ACK" is a derogatory term towards a rival gang, the CRIPS, and that it meant "A CRIP Killer" (*id*. at 2808).

The officer described an incident that took place on October 22, 1998, at Killeen High School where there was an altercation between a CRIPS member and a Blood's member that was broken up by school officials (*id*. at 2809-10). Later, a carload of Bloods from Two-One-Two PIRU arrived, including Bernard, and an assault ensued (*id*. at 2809-10).   The officer first noticed Bernard when Bernard

54

confronted a rival gang member from the Four-One-Three CRIPS, and the two threw up gang signs (*id*.).   Bernard started rubbing his teeth at him (*id*.).

### There Was No Ineffective Assistance As To The Gang Evidence

Contrary to Bernard's claims, based on the actual evidence, it would not have been fruitful to attempt to characterize Bernard's identification as a Blood as being weak, casual, or impermanent.   Bernard committed a multitude of crimes with his fellow Bloods gang members. Vialva, Bernard, and Brown kicked down the doors of more than two dozen houses.   Twenty-five burglaries is significant gang activity whether in a large-city urban setting or a smaller city like Killeen. This was not "wantabe" activity, or a "grouping of neighborhood kids."[9]   Bernard had, at least for a period of time, the "A CRIP Killer's" sign in his teeth.   He engaged in gun acquisition and trading.   There was nothing weak or casual about this gang activity.

### Coons' Testimony

Bernard also claims that counsel was ineffective for failing to seek a limiting instruction as to the government's psychiatric witness, Dr. Richard Coons, who was

---

9 Although Bernard was not named as a participant, Texas Ranger John Aycock reported that James Presley revealed that a group of the "Two-One-Two PIRU" members got into an altercation on the highway with a motorist, who was driving with his family (R(B). 24, 2820-21).   The members of the "Blood vehicle got to throwing gang signs" (*id*.). The driver of the other vehicle stopped, and Antonio Jackson shot and killed the man (*id*).   Vialva was present in the vehicle with Jackson and Presley (*id*.).   This was not small-scale gang activity as suggested in Bernard's Application.   Arguing that the gang activity was superficial would not have been accurate.

called as a rebuttal witness regarding evidence presented by Vialva (Brief at 42), and that this resulted in outcome changing prejudice (Brief at 58-60). There was no ineffective assistance as to a limiting instruction. There was never any doubt that Dr. Coons' testimony related only to Vialva. Dr. Coons agreed that he had been employed by the government to examine "the offense report records and the medical records as to Chris Vialva" (R(B). 25, 3156). In actuality, Bernard's counsel used Dr. Coons' testimony to his advantage in his argument at the punishment phase. Bernard's counsel argued that, based on the differing facts and circumstances between Bernard and Vialva, there were far less factors relating to a future threat with regard to Bernard than as to Vialva (R(B). 26, 3242).[10]

Adjustment To Supervision And Confinement
Bernard's Expression Of Remorse

The next complaint is that counsel was ineffective for failing to present evidence of Bernard's positive response to supervision or potential incarceration, and not presenting enough evidence about remorse (Brief at 41). Bernard argues that this evidence would have been outcome changing at the penalty phase (Brief at

---

10  Bernard's counsel argued (R(B). 26, 3242):
    Think about what the Government put on when they talked to Dr. Coons. Dr. Coons is the psychiatrist from Austin [who] testified about Mr. Vialva. Do you remember what Dr. Coons said about Brandon Bernard? You're going to have to think about that one, because he didn't say one word about Brandon Bernard. He didn't say anything about Brandon Bernard that makes Brandon Bernard a future threat. And I would suggest to you that means he did that, because there's a reason. There is a reason for that.

61-63, 68-69). Bernard presented a similar argument in his section 2255 motion where he noted that his positive response while on juvenile probation two years before the murders, and his "successful adjustment to incarceration" should have been a part of counsel's mitigation presentation (R(B). 6, 1297-99). This complaint is without merit (R(B). 24, 2780). Bernard's response to juvenile arrests and proceedings was to commit more crimes. It was reasonable to ignore his prior failures. As to his jail behavior, Bernard's motion acknowledged that in a one-year period in the McLennan County Jail, he was disciplined for misbehavior on two occasions (R(B). 6, 1298). This fact would have been a two-edged sword. It was also reasonable to ignore these infractions. In the punishment argument, Bernard's counsel repeatedly emphasized that in Bernard's history he was not "physically abusive" (R(B). 26, 3237, 3242). This was not unsound strategy by Bernard's trial counsel.

Furthermore, Bernard's positive adjustment to incarceration was cumulative and largely presented to the jury through the testimony of Matthew Mitchell, one of Bernard's long-standing friends (R(B). 28, 2873-74). Mitchell testified that he had spoken to Bernard three times while Bernard was incarcerated (*id*. at 2878). Bernard told him: "Matt, I have more peace now than I ever had in my life, because I found the Lord" (*id*. at 2879). Further, Bernard expressed remorse for his

involvement (*id.*).   Additionally, Bernard said:   "he wished that he would have found all this before he got into this" (*id.*).

Mitchell's testimony was emphasized by Bernard's counsel:

> And I want you to think back to the witnesses that Brandon Bernard brought to you, generally, friends, neighbors.   Think about what "Matt" Mitchell said.   Matthew Mitchell was the very articulate young black man that came in.   He said that Brandon had talked to him since then, and Brandon is remorseful and that he's had a conversion experience.   He said he's not a leader, he's a follower. Think about what the other people that testified said.   He's a follower.   He's respectful.   He's gentle.   He's caring.   He's compassionate. . . .

Counsel was not ineffective as to these claims.

Victim Impact

Next, Bernard renews the complaint made on direct appeal that parts of Donna McClure's testimony were irrelevant and inflammatory, as well as other victim impact testimony (Brief at 44), and that this resulted in outcome changing prejudice (Brief at 67-68). In this Court's opinion in *Bernard*, 299 F.3d at 480-81, it was recounted that Stacie's mother, Donna McClure, made irrelevant religious references ("that heaven and hell are real" and for Defendants "to put their faith in Jesus Christ for the forgiveness of their sins") in personally addressing Bernard and Vilava.[11]   This Court determined that this testimony "might have been excluded by

---

11    On the other hand, as this Court explained, there was no error in admitting statements regarding the religious beliefs and activities of the victims.   *Bernard*, 299 F.3d at 479).

timely objection," but that Appellants had "failed to demonstrate that admission of this testimony affected their substantial rights."  *Id*. at 479-80 ("we do not believe [the witnesses] could have inflamed or prejudiced the jury against appellants").[12]

Additionally, Stacie's mother and father offered opinions that characterized Defendants and about the nature of their crime.  *Id*. at 480. This Court determined that this testimony also did not affect substantial rights.  *Id*. (observing that "this inadmissible portion of the victim impact testimony was short and mild compared to the horror of the crimes and the pathos of the admissible impact on the parents").

## Conduct Of The Sentencing Hearing

Bernard next challenges the conduct of the sentencing hearing as ineffective assistance (Brief at 45-50).   Counsel may make a strategic choice as to the approach to take at the penalty phase. As discussed above, to demonstrate that counsel's performance was constitutionally deficient a movant must show errors so serious that counsel was not functioning as the counsel guaranteed to the defendant by the Sixth Amendment.  *Strickland*, 466 U.S. at 687. Bernard's criticisms in hindsight are without merit.   The evidence and circumstances show that Bernard's counsel

---

12   This Court also noted that the jurors had not been urged to use a religious standard in reaching their verdict, jury instructions addressed the risk of prejudice, and the jurors had signed a statement that religion played no part in their sentencing decision.  *Id*. at 479-80.

chose an approach to humanize Bernard.    He has not shown that it was constitutionally ineffective to follow this plan.[13]

In *Rutherford v. Crosby*, 385 F.3d 1300, 1314 (11th Cir. 2004), the Florida state courts determined counsel's decision, that it was unnecessary to engage a mental health expert or to obtain and present more detailed mental health evidence, was sensible in light of the punishment-phase strategy to "humanize" defendant and portray him as a hard-working, family oriented, "Boy Scout" type.    The Eleventh Circuit, in discussing prejudice, also contrasted the ineffective assistance in *Wiggins*, 539 U.S. 510, where the jury heard little mitigating evidence (although defendant had an "excruciating life history"), with Ruthford's case, in which the mitigation evidence emphasized his goodness as a hard-working family man that had served his country.    *Id.* at 1315-16.    Thus, in *Wiggins*, it would not have been counterproductive to present the additional mitigation evidence.    *Id.*    In contrast, in Ruthford's case, expert mental health evidence would have "come with a price" of

---

13    In *Dowthitt v. Johnson*, 230 F.3d 733, 751 (5th Cir. 2000), the court denied petitioner's claim that trial counsel was deficient during closing arguments during the penalty phase.    Petitioner faulted counsel for arguing that: Dowthitt suffered from a disease that resulted in his acting in a "frenzy, like the feeding of a shark or something," and Dowthitt would not be a future danger by positing that his only victims in prison would be "effeminate men."    *Id.*    The court emphasized that while they would not endorse every aspect of counsel's statements, taken in full context, counsel was arguing that Dowthitt's actions were not deliberate and he did not present a continuing danger.    *Id.*    The court would not second-guess strategic decisions based on *Strickland*.    *Id.*

being harmful to counsel's portrayal. *Id.*[14]   Additionally, the weight of the aggravating circumstances of the murder weighed against a finding of prejudice. Id.  In the instant case, the evidence now proposed by Bernard also would have come at the price of being harmful to counsels' portrayal of Bernard as a kind person that had make a grave mistake as a result of being a follower.

As noted above, counsels' punishment-phase presentation had order and momentum. The witnesses uniformly portrayed Bernard as "kind," "respectful," a "very good person," and someone who was not inclined to hurt anybody. Following these witnesses, Bernard's girlfriend also testified to Bernard's good qualities, adding that he was very helpful to others. She thought Bernard had made a mistake out of fear. She thought he was too willing to give his friends a ride.  Finally, Bernard's mother spoke about Bernard's positive qualities and also made a powerful emotional appeal to spare her child the death penalty. Finding all these individuals to say good things about Bernard was not a deficiency.

---

14  In *Walton v. Angelone*, 321 F.3d 442, 465 (4th Cir. 2003), Walton claimed that his counsel failed to investigate and present mitigating mental health evidence. Specifically, he asserted that his counsel was ineffective for failing to pursue a sentencing strategy to show that Walton was a schizophrenic who could be treated with medication to reduce his dangerousness and that it was mental illness that accounted for his behavior.  *Id*.  Instead counsel presented a mitigation case that presented him as a good young man despite what he had done.  *Id*.  The Court determined that Wilson could not show that his counsel's performance fell below an objective standard of reasonableness.  *Id*.

The instant case is far different from cases cited by Bernard such as *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003), where defense counsel in a capital case offered only one witness in the penalty phase, the defendant's pastor, who povided personally remote and generic testimony. The instant case, on the other hand, employed a plan to humanize Bernard, with personal and emotional testimony, portraying him as a family-oriented, kind person, who, because of following Vialva, made a terrible mistake.

As found by the district court, additional evidence of Bernard's good nature, his non-violent tendencies, his habit of following stronger personalities like his cousin Melsimeon Pollock, the strain of the divorce of Bernard's parents, and past incidents of violence would have been cumulative of the evidence presented and did not constitute ineffective assistance of counsel (R(B). 8, 146-47). Bernard has not made a viable COA of deficient performance.

### There Was No Strickland Prejudice

It was not ineffective assistance to choose the kind-person approach rather than the broken-vessel approach. Nevertheless, there is not a reasonable probability of a different outcome with the addition or substitution of family distress, drug-use, and a mild neurocognitive problem. This was a case in which the aggravating circumstances were strong. After the gang held their captives for hours, Bernard

participated in the brutal murders of the helpless Bagleys, for monetary gain, after rejecting their pleas to spare their lives.

### C(B).    BERNARD'S *BRADY* CLAIMS

Bernard's *Brady* claims (Brief at 73-83) are addressed, below, in conjunction with Vialva's *Brady* claims.

### D(B). BERNARD FAILED TO ESTABLISH THE DISTRICT COURT ERRED IN DENYING DISCOVERY

Bernard also seeks a COA as to the denial of discovery regarding the *Brady* claim regarding Brown's attorney's notes constituting impeachment evidence of Brown.   This claim is fully analyzed under the *Brady* claims section, below. Basically, as demonstrated above, Brown was relentlessly cross examined as to prior inconsistent statements which largely contained "lies." Any further inconsistent statements would have been cumulative.   As to Brown's recorded statement about starting the fire by throwing a match, in the trial Brown testified that he did not actually see Bernard set the car on fire (R(B). 19, 1926). Thus, whether there was a prior statement that a match came through a window, or another way, is not material because Brown admitted at trial that he did not see Bernard start the fire and that his prior statements had been lies. As to prior criminal conduct, that too was cumulative of Brown's criminal gang conduct.

63

## E(B). BERNARD FAILED TO ESTABLISH
## HIS CONVICTION VIOLATED THE FIFTH AMENDMENT

In a brief argument, Bernard raises his defective-indictment issue that he raised in his direct appeal (Brief at 84-85). Bernard recognizes that as to this issue his "arguments are foreclosed here by Fifth Circuit precedent" but he "nevertheless raises them to preserve them for further review by the *en banc* Court or the Supreme Court" (Brief at 85).

In his direct appeal, he argued that his sentence was unconstitutional because the grand jury did not find, nor did the indictment allege, the existence of mental state and statutory aggravating factors required by the FDPA for imposition of the death penalty. This Court determined that the challenged error in the indictment did not amount to plain error based on overwhelming evidence. *Bernard*, 299 F.3d at 488-89. Subsequently, this Court has recognized that such error may be harmless. *United States v. Robinson*, 367 F.3d 278, 284, 286 (5th Cir. 2004). Again, it was harmless here based on overwhelming evidence.

## F(B). THERE WAS NO CUMULATIVE ERROR

Finally, there were no errors and there was no cumulative error. Even if there were errors, they did not cumulatively so infect the trial with unfairness so as to deny due process. *See Derden v. McNeel*, 978 F.2d 1453, 1461 (5th Cir. 1992) (*en*

*banc*) (in denying habeas relief, observing that even if there were errors, they did not cumulatively so infect the trial with unfairness so as to deny due process).

## 2(V).   VIALVA'S CONFLICT-OF-INTEREST CLAIM WAS PROCEDURALLY DEFAULTED; NEVERTHELESS, VIALVA FAILED TO ESTABLISH HIS CLAIM THAT ONE OF HIS ATORNEYS HAD AN ACTUAL CONFLICT OF INTEREST, BASED ON THE ATTORNEY SEEKING EMPLOYMENT WITH THE U.S. ATTORNEY'S OFFICE, OR THAT, AFTER A PRE-TRIAL HEARING, VIALVA INEFFECTIVELY WAIVED ANY POTENTIAL CONFLICT

(Responsive to Vialva's Brief in Support of COA, Issue Two, 17-27)

**Vialva's Conflict Claim And *Brady* Claim, Were Procedurally Defaulted**

The district court ruled that Vialva's conflict claim and the *Brady* claims had been procedurally defaulted. The Supreme Court has explained that a collateral challenge to a conviction or sentence "may not do service for an appeal." *United States v. Frady*, 456 U.S. 152, 165 (1982). Therefore, a defendant who raises a constitutional or jurisdictional claim for the first time on collateral review, when those claims could have been asserted on direct appeal, must show both cause for his procedural default and actual prejudice due to any such errors. *Id.*   The "cause and actual prejudice" standard is more rigorous than the plain error standard used on direct review.  *Id.* at 167.   The cause and actual prejudice test applies even where the defendant alleges a fundamental constitutional error, and when the default was

the result of inadvertent attorney errors as well as deliberate tactical decisions. *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991).

Any issue arising from a perceived potential conflict was fully known after the pre-trial hearing and certainly before Vialva's direct criminal appeal. The allegedly conflicted attorney was not part of the appellate team. As noted by the district court, Vialva did not claim a failure to receive the "Final CID Report," and thus, the *Brady* claims could have been raised on direct appeal. Vialva's attempt to overcome the cause and prejudice standard for failing to raise the conflict claim and the *Brady* claim in his direct appeal rests on ineffective assistance of one of his two appellate attorneys, Steven Loach, who, at some time, became ill. The affidavit from his wife indicates that: Mr. Loach began (at an undisclosed date) experiencing severe neck pain; he had his first surgery in November of 2001; after this time, he was in pain and could not work; he had a second surgery in March of 2002 and ultimately died (R(V). 8, 1243). Stanley Schwieger was trial co-counsel and co-appellate counsel. Their appellate brief was filed on May 30, 2001 (revised on June 28, 2001). As the district court observed, this was long before Loach's first surgery that rendered him incapacitated (R(B). 8, 109). Vialva did not meet the cause and prejudice standard.

**Vialva's Conflict-Of-Interest Claim**

Vialva argues under this section that a COA should issue as to his claim of an "unwaived" conflict of interest.  In his 2004 section 2255 motion, Vialva asserted that one of his attorneys, B. Dwight Goains, was ineffective in that he applied for employment with the U.S. Attorney's Office while the trial was still pending without first securing Defendant's consent or without securing an effective waiver after the conflict had arisen.  This claim is entirely without merit.  There was never any actual conflict.  Further, as the district court recounted, after a hearing in which Mr. Goains' employment efforts were detailedly set forth, and being advised by the court of his options, Vialva made an informed and valid waiver of any conflict and opted to continue with Goains as his attorney. Vialva confirmed that he was waiving his right to subsequently complain about any conflict.

**Background**

Appointment Of Counsel

A criminal complaint was filed on June 22, 1999, charging Vialva with carjacking, and on June 24, Attorney Schwieger was appointed to represent Vialva. On July 13, 1999, Vialva was charged in a four-count indictment, with three of the counts potentially involving the death penalty. On July 16, Mr. Schwieger filed a "Motion for Appointment of Co-Counsel in Death Penalty Case," in which he

67

advised this Court of Mr. Goains' experience in capital litigation and Mr. Goains' availability for appointment. Mr. Goains was appointed on July 21, 1999. The jury trial in this case began on May 15, 2000.

### Mr. Goains Applications For Employment

In a letter to Vialva's habeas counsel, Mr. Goains confirmed that he first interviewed for the position of Assistant United States Attorney ("AUSA") in "[e]arly February, 2000" (R(V). 8, 1198, 1200-01). Mr. Goains related that he was informed that this application for employment with the United States Attorney's Office was rejected in "early March, 2000" (*id.*). Mr. Goains further related that he sent a letter expressing his continued interest in the position of AUSA on "March 6, 2000" (*id.*).

### The District Court's Conflict Hearing

On May 12, 2000, three days before the scheduled start of the trial, the district court conducted a pre-trial hearing concerning Mr. Goains' potential for conflict as Vialva's counsel for the upcoming capital trial after having applied for a position as an AUSA in the Western District of Texas and having "more than an excellent chance" of receiving an offer (R(V). 8, 1193).

Mr. Goains began the hearing by explaining, in open court, in the presence of his client, Vialva, that (*id.*):

68

[A]s this Court is well aware, Your Honor, for about the last eight or ten years I've been trying to apply to be an Assistant United States Attorney. Your Honor, several months ago I applied and it appears, at this time, that there's two positions open in Del Rio and one in Pecos. It also appear[s], Your Honor, that there's more than an excellent chance I may receive a[n] offer for one of those positions as Assistant U.S. Attorney.

Mr. Goains further explained that (*id*. at 1193-94):

I'm a Board Certified Criminal Lawyer, Your Honor, and over the last ten years I've tried eight capital murder cases. I've gone over this with my client, Mr. Vialva. It's just a matter, Your Honor, we want to make sure that Mr. Vialva is clear that my applying for a U.S. Attorney position has absolutely nothing to do with his case, nor has the U.S. Attorney's office ever mentioned this case to me and I've never mentioned his case to the U.S. Attorney's Office. It's just a matter, Your Honor, that we want to make sure that, you know, in three months or four months or next week, if the offer comes in – and I can assure the Court if that offer does come in, I'm going to accept it – that Mr. Vialva, I want him to feel free and clear that I've always and will always do one-hundred percent what's in his best interest and defend him, to the best of my ability. And I've gone over that with my client. And I've also asked Mr. Vialva if he would like me to formally withdraw from his case or ask for another attorney to be substituted, and it's my understanding that Mr. Vialva has no problems with myself and wishes I continue to represent him.

Vialva was then sworn, and he answered questions from Mr. Goains (*id*. at 1194-95):

Q. Mr. Vialva, you and I have gone over the fact that I've applied for the U.S. Attorney's Office, is that correct?

A. Yes, sir.

Q.   You understand I've been trying to do this for a long, long time?

A.   Yes, sir.

Q.   And, again, it – I guess, in the final outcome, I may get rejected, okay, but the bottom line is, I may also be offered a position, and if they do, I would accept it.   But do you understand that that has absolutely no bearing on your case?

A.   Yes, sir.

Q.   And that we've been preparing for this case for several months now, Mr. Schwieger and I.   Are you satisfied so far with our representation?

A.   Yes, sir.

Q.   Do you feel that we're doing everything in your best interest?

A.   Yes, sir.

Q.   Do you – would you wish for me to withdraw and have this Honorable Court substitute counsel, or would you wish I continue representing you and assisting Mr. Schwieger, to the best of my ability?

A.   I wish that you continue representing me.

The prosecutor then requested that the district court "inquire, to the extent there is any conflict, if there is any, that Mr. Vialva waives it and understands that that's permanent waiver of any type of potential issue" (*id*. at 1195).

This court then addressed Vialva (*id*. at 1196):

Q.   Mr. Vialva, two things.   First of all, if you did want me to appoint you a different lawyer from Mr. Goains, then, I would certainly

70

consider that.    The other is, that if the Court accepts your decision, that this does not create a problem for you, then later on, if you're convicted, you couldn't come back and say, "Well, I didn't get a fair trial, because Mr. Goains had applied for a job with the U. S. Attorney's Office.    Do you understand that?"

Vialva answered: "Yes, sir" (*id*.).

Mr. Goains' Application For Employment
Was Accepted More than Three Months
After He Had Withdrawn From The Case

After Vialva's jury trial was completed, he was sentenced on June 13, 2000. On June 29, 2000, an order was entered granting Mr. Goains' motion to withdraw as Vialva's counsel (because Mr. Goains did not wish to represent Vialva during the appeals process).

In the letter to Vialva's habeas counsel, Mr. Goains indicated that on October 3, 2000, more than three months after withdrawing from Vialva's case, Mr. Goains interviewed for the position of AUSA (R(V). 8, 1198, 1200-01).    On October 6, 2000, a conditional offer of employment was extended to him (*id*.).    On February 6, 2001, a final offer of employment was extended (*id*.).

**There Was No Actual Conflict Of Interest;
There Was A Valid Waiver Of A Potential Conflict**

<u>Right To Counsel of Choice</u>

Although not an unfettered privilege, a defendant has the Sixth Amendment right to choose his own counsel.   *Wheat v. United States*, 486 U.S. 153, 159 (1988). A district court is afforded broad latitude in deciding whether countervailing considerations, such as a potential conflict of interest, require the rejection of a defendant's preferred counsel.   *Wheat*, 486 U.S. at 159; *United States v. Izydore*, 167 F.3d 213, 220 (5th Cir. 1999).

<u>Vialva Must Establish An Actual Conflict
Of Interest Which Meets The *Strickland* Test</u>

"In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely impacted his lawyer's performance."   *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980) (footnote omitted).   The mere possibility of a conflict of interest "is insufficient to impugn a criminal conviction." *Id.* at 350.

Application of *Cuyler* has been limited by this Court to conflicts involving multiple representation.   *See Moreland v. Scott*, 175 F.3d 347, 348-49 (5th Cir. 1999) (citing *Beets v. Scott*, 65 F.3d 1258, 1265-72 (5th Cir. 1995) (*en banc*)). Alleged conflicts resulting from representation affected by an attorney's self-interest

72

"are evaluated under the more relaxed *Strickland* standard." *Id*. In the instant case, Vialva has failed to make a preliminary *Strickland* showing of an actual conflict or defective performance or prejudice.

### *Garcia*

In *Garcia v. Bunnell*, 33 F.3d 1193 (9th Cir. 1994), on the morning of the first day of defendant's trial for the offense of first-degree murder, at an *ex parte* hearing, "defense counsel Craig Holmes announced that he had accepted a position, to commence at the end of the trial, with the prosecution -- the San Joaquin County District Attorney's office." *Id*. at 1194-95. In *Garcia*, after the defendant "expressed reservations about proceeding," the trial court granted him a five-day continuance to seek advice. *Id*. at 1195. "After this hiatus, Garcia declared that he would accept Holmes' representation," and the jury found Garcia guilty. *Id*. In his petition for habeas relief, Garcia claimed that there was an actual conflict of interest and that, "far from waiving his right to conflict-free representation, he timely objected to Holmes' conflict of interest, and that the trial court's failure to inquire thus mandates reversal of his conviction." *Id*. at 1197-1200. The Ninth Circuit rejected these and other arguments. *Id*.

The court in *Garcia*, in applying *Cuyler*, found that the record on appeal did not disclose that counsel actively represented competing interests. *Id*. at 1198.

73

The court noted that defense counsel "himself in no way suggested that he thought his advocacy for Garcia could be impaired; he merely thought it appropriate to alert the court." *Id.* The court acknowledged the presumption that a lawyer is fully conscious of the overarching duty of complete loyalty to his or her client, and that trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. *Id.* at 1198-99 (citations omitted). The court held in *Garcia* that "[t]he mere fact of Holmes' future employment plans did not create an actual conflict." *Id.* at 1199 (citations omitted).[15]

As to the issue of waiver, in *Garcia*, the court also held that even if it were assumed that counsel was subject to an actual conflict of interest, the trial court may generally allow the attorney to proceed where there is a voluntary, knowing, and intelligent waiver. *Garcia* at 1195. The court held that Garcia "knowingly, intelligently, and voluntarily decided to accept continued representation from Holmes despite the potential conflict presented by Holmes' future employment." *Garcia* at 1195-98.

---

15   As to the issue of whether a conflict of interest exists in such a situation, more recently, in U*nited States v. Johnson*, 327 Fed.Appx. 748, 750 (9th Cir. 2009) (unpublished), in a direct appeal as to a claim of ineffective assistance, the Ninth Circuit explained: "Further, counsel's **failure to disclose** to his client that he had **submitted his resume** to the United States Attorney's office **did not create a conflict of interest**" (citing *Garcia*, 33 F.3d at 1199) (emphasis added).

74

In support of this holding, the *Garcia* court noted that at that hearing Garcia asked for and received more time for consideration, as he had "reservations" about his defense counsel "going over to the other side." *Id*. at 1196.    The trial court said Garcia was "certainly entitled to a couple of days" to think about his lawyer's continued representation, but that the court probably would be reluctant to excuse counsel because there was nothing to indicate that he was inadequate.    *Id*.    A few days later, the hearing resumed with Garcia announcing that his decision was "to stick with Mr. Holmes at this time."    *Id*. at 1197.    The *Garcia* court concluded that "given the facts and circumstances of this particular case we do not doubt that Garcia knowingly, intelligently, and voluntarily waived any rights even potentially implicated by [defense counsel's] announcement [that at the conclusion of the trial he would join the prosecutor's office]."    *Id*.

In the instant case, like counsel in *Garcia*, Mr. Goains himself in no way suggested that he thought his advocacy for his client could be impaired; he merely thought it appropriate to alert the court.    Here, there is even less support for a potential conflict than the support found insufficient in *Garcia*. Garcia's counsel had accepted a position with the prosecutor's office that would commence at the conclusion of the trial. Vialva's counsel, on the other hand, had been rejected by the prosecutor's office, and merely indicated that he had a continuing interest, an

75

interest he had maintained over many years as a defense attorney, for potential future employment as an AUSA.

Additionally, during his *in camera* hearing, Garcia expressed some doubts as to whether Mr. Holmes might be "palsy-walsy" with the district attorney, Vialva at his hearing, days before his trial, expressed no such doubts, but instead declared his satisfaction with the representation of both of his attorneys, stated his belief that they were "doing everything" in his best interest, testified that he did not wish Mr. Goains to withdraw, and announced that he wished Mr. Goains to continue to represent him ("I wish that you continue representing me").

In the instant case, just as in *Garcia*, "[t]he mere fact of [defense counsel's] future employment plans did not create an actual conflict." *See Garcia* at 1199. Furthermore, in the instant case, just as in *Garcia*, even if there was a potential conflict, Vialva knowingly, intelligently, and voluntarily waived any rights even potentially implicated by defense counsel's announcement of his continuing interest in a future position with the prosecution. *Id*. at 1197. Vialva has presented no case authority that a waiting period is mandatory where no reservations were expressed.

### *Horton*

In *United States v. Horton*, 845 F.2d 1414, 1418 (7th Cir. 1988), the Seventh Circuit held that there was no actual conflict of interest where defense counsel was

76

seeking employment as United States Attorney at the time of trial proceedings. The *Horton* court noted that it may be conceivable that an unprincipled defense attorney in line for a job as a prosecutor might take an action contrary to his client's best interests, but that was "too fanciful upon which to base a *per se* rule of conflict." *Id.* at 1419-20. The Seventh Circuit held that: "We will not indulge the presumption that a defense attorney who is being considered for a position as United States Attorney is unable to represent a defendant in federal court to the best of his ability and with the defendant's best interests in mind." *Id.* In fact, the natural conclusion is the employment candidate will try his best for his client: "a candidate for a high federal position in his professional field would not advance his own interests by demonstrating that he is a weak or unskilled attorney on behalf of his client's interests." *Id.* In the instant case, Vialva's claim is based on the purely speculative notion that Vialva's counsel took some action contrary to Vialva's best interests because of counsel's goal to someday become a prosecutor. On the contrary, after evaluating Mr. Goains performance as an experienced capital litigator in this case, the reasonable conclusion is that he made a great effort on behalf of Vialva as a demonstration of his prowess as a litigator.

Other Cases

In *Adanandus v. Johnson*, 947 F.Supp. 1021 (W.D.Tex. 1996), aff'd 114 F.3d 1181 (5th Cir. 1997) (unpublished), in a collateral attack, a defendant convicted of a capital offense claimed that his counsel was ineffective because he had been a "candidate for the position of United States Attorney for the Western District of Texas and later successfully ran for the office of Bexar County District Attorney." *Id.* at 1054.   Adanandus argued that because of what he characterized as a "conflict of interest," *Strickland* prejudice must be presumed.   *Id.*   The district court, however, based on Fifth Circuit authority, rejected that argument.   *Id.* at 1054-55 (citation omitted).

The district court in *Adanandus* went on to further explain that "[w]hile the fact petitioner's trial counsel was engaged in seeking the position of U.S. Attorney at the time of petitioner's trial might have presented a potential conflict of interest, petitioner has alleged no facts showing this potential conflict ever evolved into an actual conflict [footnote omitted]."   *Id.*

Finally, in *United States v. Unruh*, 855 F.2d 1363, 1379 (9th Cir. 1987), Fowler, one of the co-appellants, claimed in his direct criminal appeal that "he was denied his sixth amendment right to effective assistance of counsel because his attorney, failed to inform him until just before trial that he had applied for

employment [as an AUSA]." Fowler argued "that this conflict of interest adversely affected his attorney's performance," and he requested a remand for an evidentiary hearing. *Id.*

The Ninth Circuit in *Unruh*, noted that Fowler "provides no evidence of misconduct." *Id.* The court, in denying this claim, stated that "nothing in the record suggests that counsel allowed anything to adversely affect his representation," and "Fowler has not shown that he was victimized by ill-advised strategy produced by counsel's alleged conflict of interest." *Id.*

The affidavit of Mr. Fox does not cite any case law holding that application for a position at the U.S. Attorney's Office (or similar position) during the pendency of a trial is a *per se* conflict of interest. The cases cited above, in fact, hold to the contrary.

Vialva has not shown this issue to meet the COA standard based on procedural default or on the merits. The district court correctly determined:

> The record reflects that Goains applied for a position with the U.S. Attorney's Office in early February, 2000, but his application was rejected in early March, 2000. He sent a letter expressing his continued interest on March 6, 2000. Goains obtained a waiver of conflict from Vialva on May 3, 2000 and requested a hearing, which was held on May 12, 2000, three days before the start of trial. At the hearing Goains explained that there were two additional open positions with the U.S. Attorney's Office, and he thought he had an excellent chance of receiving an offer. After being advised by the

> Court of his options, Vialva confirmed his waiver of conflict and opted to continue with Goains as his attorney. Vialva stated that he was waiving his right to subsequently complain about any conflict. After the trial was over and Goains withdrew from the case, he was offered and accepted one of the open positions.

Vialva argues that Vialva was too young and unfamiliar with the criminal justice system and could not make an intelligent waiver. Vialva, however, was nineteen years old and he had some experience with justice system (R(V). 24, 2726-27). More importantly, the potential for conflict, the potential risk, was not complex or difficult to discern. It was, as the unsophisticated defendant in *Garcia* stated, the potential that the defense attorney who was a prosecution job-seeker might be "palsy-walsy" with the prosecutor's office. Here, Vialva was informed on the situation and, days later, had a hearing before the district court. Vialva was convinced the experienced capital litigator, Mr. Goains, would represent him to the best of counsel's ability. When warned that he could not later complain of a conflict, Vialva knowingly waived any potential conflict.

The fully disclosed prospect of future employment did not create an actual conflict, Mr. Goains never actively represented conflicting interests, there was a valid waiver, and Mr. Goains had no "failures" that resulted in prejudice. Vialva has not made a preliminary that discovery or a hearing would be appropriate.

**3(V). & C(B).   APPLICANTS HAVE NOT ESTABLISHED A *BRADY* VIOLATION;  NO MATERIAL EVIDENCE WAS WITHHELD THAT WOULD HAVE CAST DOUBT ON THE TESTIMONY OF BROWN AND LEWIS, AS THEIR PAST INCONSISTENT STATEMENTS WERE FULLY EXPLORED AND UTILIZED BY BOTH DEFENDANTS; THERE HAS BEEN NO SHOWING THAT UNDERMINES CONFIDENCE IN ANY OUTCOME**

(Responsive To Vialva's Ground Three, 27-36; Bernard's Ground C, 73-84).

### General Background And Overview

The primary basis of this claim by both Applicants is that evidence of prior inconsistent debriefing statements by Brown and Lewis was withheld that would have significantly aided in the impeachment of the two of the co-defendants who testified at the trial.  Initially, upon their arrest, both Brown and Lewis lied as to their part in the crimes and the role of their fellow gang members. The inconsistencies between their prior statements and their trial testimony were exhaustively utilized and exploited by Vialva's defense team and Bernard's defense team in questioning Brown and Lewis, and in argument to the jury.  Any potential additional information as to other prior statements would have been cumulative to the wholly inconsistent prior statements, expertly utilized by defense counsel

In explaining the prior inconsistent statements, the gist of Brown's testimony was that he initially denied everything; he only admitted facts during subsequent interviews and statements as those facts became known to the investigators. Lewis

initially lied to investigators as well. It was only after each of them had decided to fully cooperate and testify, that they revealed the truth about the murders and their part in the murders. This background was fully explored before the jury. The jury chose, nevertheless, to believe their compelling trial testimony. Applicants have not shown a reasonable probability that any other prior inconsistent statements would have changed the result of the guilt phase or punishment phase of the trial.

### Standards Of Analysis

The starting premise with regard to a *Brady* claim is that "the prosecution has a duty to turn over impeachment evidence favorable to an accused when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Hughes*, 230 F.3d 815, 819 (5th Cir. 2000) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). There are three components to a violation under *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* First, the evidence must be favorable to the accused, a standard that includes impeachment evidence. *Id.* Second, the prosecution must have suppressed the evidence. *Id.* Third, the defendant must have been prejudiced" (which is "the materiality component"). *Id.* (citing *Strickler v. Green*, 527 U.S. 263, 281-82 (1999)).

Evidence is not "suppressed" if the defendant knows or should know of the essential facts that would enable him to take advantage of it. *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002) (citation omitted). When information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the court is his lack of reasonable diligence, the defendant has no *Brady* claim. *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980).

When a defendant "can only speculate as to what the requested information might reveal, he cannot satisfy *Brady's* requirement of showing that the requested evidence would be favorable to [the] accused." *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010) (citations and internal quotation omitted).

"The materiality inquiry turns on the question of whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Hughes*, 230 F.3d at 819 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). If there is more than one violation, the cumulative effect must be considered. *Id*. (citing *Kyles* at 421-22).

The defendant "has the burden to establish a reasonable probability that the evidence would have changed the result." *Id*. (citing *Strickler* at 291). If a reviewing court finds that the defendant did not establish a reasonable probability

83

that the evidence in question would have produced a different result, the other *Brady* components need not be considered.    *Hughes*, 230 F.3d at 819.

Where allegations with respect to both the suppression and materiality *Brady* prongs are of a speculative and conclusory nature, an evidentiary hearing would serve as nothing more than a "fishing expedition," and is not available to find support to validate allegations.    *United States v. Edwards*, 442 F.3d 258, 268 n.10 (5th Cir. 2006).

### Defense Counsels' Cross-Examination Of Brown And Lewis

The cross-examination of Brown and Lewis is set forth in some detail, above, in the context of ineffective assistance claims.    That cross-examination is set forth in greater detail in the government's section 2255 responses (R(B). 7, 1436-83 (Brown), 1484-1517 (Lewis)).

In just a sampling, Mr. Goains, one of Vialva's attorneys, in cross-examining Brown, continuously pointed out inconsistencies and contradictions between Brown's testimony and his "several prior statements" (R(B) 19, 1938):    asking "And in each of these statements, you changed your statements, didn't you?" (*id.*); asking "isn't it true that each of those statements are dramatically different?" (*id.* at 1938-39); confronting Brown with his prior statement at the Army's CID office, Defendant's Exhibit 5 (*id.* at 1939-40), and, after discussing certain facts, asking

"That's not even close to the information you just gave this jury, correct?" (*id*. at 1940); eliciting from Brown that he made his statement "before the deal was even approached, and this was before any information was known on the matters" (*id*.).

Vialva's counsel focused on further inconsistencies: highlighting that Brown initially denied knowing who set "the car on the hill" on fire, how the vehicle on fire had arrived at that spot, and who killed the people found in the trunk (*id*. at 1941); making the point that this prior statement was different from the one he "just gave to the jury" (*id*.); and eliciting from Brown that he made those statements "before the deal was offered" and before "they even knew that we had did the crime" (*id*.).

As to another voluntary statement given by Brown "a little bit later," at 12:30 on June 22, Vialva's counsel focused on Brown's prior discussion of his position relative to the Bagley's car and trunk in contrast to his trial testimony (*id* at 1941-44, Def.Ex. 6). Defense counsel continued by reading from Brown's statement of June 22, and contrasting those assertions with his trial testimony (*id*. at 1944-45) ("Isn't that what you said"). Brown would respond: "Yes, sir, that's what I said at that period of time" (*id*. at 1945).

In redirect examination, as to the two statements he made "right after" he was arrested on June 22, Brown agreed with the prosecutor that he "did not tell the full

truth in those statements" (*id*. at 1960).   Brown explained that when he made the first statement, the authorities had little to no information (*id*. at 1961).   And when he made the second statement, the authorities in the Army's CID office had some information, and that Brown "just confirmed, basically, whatever he said" (*id*.).

Brown agreed that the information in his trial testimony about what he himself did in committing this crime, he "didn't even put in those statements" (*id*.).   In his trial testimony he was "not only telling more on other people," but he was "telling more" on himself (*id*.).

Finally, on re-cross, after Vialva's counsel quoted part of one of Brown's prior statements, counsel asked: ". . . I mean, you're basically the one giving the orders?" (*id*. at 1962).   Counsel followed up on Brown's assertion that for the second statement he had "basically just confirmed what the officer had said" (*id*. at 1963).

In cross-examining Lewis, Vialva's counsel, after making a number of other points, reviewed Lewis' prior inconsistent statements as to where he was and what he was doing on the morning of June 21, 1999 (R(B), 21, (2397) ("that's not what you put in your statement").   Counsel pointed out new details in Lewis' testimony that were not in his statement (*id*. at 2399) ("that's not in your statement either, is it, Mr. Lewis?"). Counsel highlighted further details about the trips to the Mickeys store and the IGA which also been omitted from his statement (after giving Lewis

time to examine his statement) (*id.* at 2399-2400). Counsel emphasized more of Lewis' omissions from his statement as to who pulled out the two guns, what items were taken from the Bagleys and how they were disposed (*id.* at 2400-01).

Bernard's counsel reviewed other "lies" told by Lewis:   Lewis' assertion in his written statement, that Vialva said that he was stopping for lighter fluid to have a barbecue, also was a "lie" (*id.* at 2419); Lewis' assertion in his statement, that when Vialva pulled up the dirt road to go up the hill, he said he was going to "his cousin's house" also was a "lie" (*id.*); Lewis' assertion in his statement that at the shooting Vialva "called us all scared," or accused them of being cowards also was a "lie" (*id.* at 2420-21).   Lewis' assertion in his statement "Chris popped the trunk open" also was a "lie" (*id.*); Lewis' assertion in his statement that Vialva shot Mr. Bagley in the center of his forehead, and that he saw the woman shot in the side of her head were not true because during the shootings he was walking down the hill, and that he had not seen the locations of the shots, testifying that "[i]t was a lie, sir" (*id.* at 2421-22). Bernard's counsel emphasized that "[t]he truth is . . . you lied about a number of different things" (*id.* at 2422).   Lewis agreed (*id.*).

**The Inconsistent Statements And "Lies"**
**Were Emphasized In Jury Argument**

The prior inconsistent statements of Brown and Lewis were continuously emphasized by defense counsel in closing argument. Vialva's counsel, Mr. Schwieger argued: that Brown was not credible because he initially "lied to the police" (R(B). 23, 2614); and that the jury could not trust someone like Brown who said "'I lied.  I got my deal.  I'm telling the truth now'" (*id*. at 2616).

Vialva's counsel, Mr. Goains, argued:  that the government's entire case "revolves around the believability of Mr. Brown and Mr. Lewis" (*id*. at 2626); that, during the trial, he asked Brown "[w]hy didn't you make that statement earlier," and Brown's response was "[b]ecause I didn't have my deal" (*id*. at 2627); that when you examine the prior statements and testimony of Brown and Lewis "we see lies, we see inconsistencies, but most of all, as they testified before you, they changed their testimonies to match each other" (*id* at 2627-280); that Lewis' testimony as to the spreading of lighter fluid, and Brown's testimony as to his positioning did not match their statements (*id*. at 2628-29); that Lewis, in his prior statement, first blamed Vialva for lighting the fire, perhaps with a cigarette, but that he abandoned that claim (*id*. at 2629); that "Terry Brown stated it the best . . . I asked him, "is this your statement?" he said, "They put it together, I signed it" (*id* at 3631).

88

A few examples from Bernard's counsel's closing argument relating the testimony of Brown and Lewis were:   there was no physical evidence tying Bernard to the crime (R(B). 23, 2640; the government's case was built only on the testimony of Brown and Lewis; Brown and Lewis were kept together and were able to "dovetail their stories" (*id.*); many of the lies told by Brown and Lewis had been just pointed out by Vialva's counsel in the previous closing argument (*id.* at 2641); and Lewis was a "liar" and "He's admitted he's a liar" (*id.* at 2643).

### The Inconsistent Statements And "Lies" Were Emphasized At The Punishment Phase

The prior inconsistent statements of Brown and Lewis also were continuously emphasized by Vialva's counsel at the punishment phase. Counsel initially argued to the jury:

> We know that the testimony of Christopher Lewis and Terry Brown, those statements proved to be inconsistent.  They proved to have changed.  And we know, Ladies and Gentlemen, that many of the statements that they gave to the officers were absolute lies.

(R(B). 26, 3212).

> As to the question of whether Vialva's intent:

> Because, you see, in order to find Mr. Vialva intentionally committed the act of shooting Mr. and Mrs. Bagley, again, Ladies and Gentlemen, you've got to believe beyond a reasonable doubt the testimony of Christopher Lewis and Terry Brown.  As Mr. Frost [one of the prosecutors] just told you, there is absolutely no physical evidence

89

which links Mr. Vialva to that shooting. We have to rely strictly on the testimony of Christopher Lewis and Terry Brown. And, Ladies and Gentlemen, we know it is highly suspect. We know, again, that they've been inconsistent, the statements have changed, and we know they've lied. . . .

(*id*. at 3213).

## Cumulative Evidence Does Not Form
## The Basis For A *Brady* Violation

"[W]hen the undisclosed evidence is merely cumulative of other evidence no *Brady* violation occurs." *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996) (citing *Allridge v. Scott*, 41 F.3d 213, 218 (5th Cir. 1994)). In *Allredge*, the prior statement by a witness was not *Brady* material because the statement established only what the evidence at trial showed to be obvious. *Id*. at 215-16.

In *Jackson v. Johnson*, 194 F.3d 641, 648-50 (5th Cir. 1999), Jackson's *Brady* claim was that there was a reasonable probability that he would have been sentenced differently had the prosecution disclosed the prior inconsistent statements of a witness, Clary. The authorities obtained several statements from Clary who was described during Jackson's trial "as initially evasive, but who increased the significance of his role with each successive interview." *Id*. Jackson was not provided with four of Clary's statements, and he contended that knowledge of the specifics of Clary's various statements would have better armed him to impeach

90

Clary's testimony.  *Id.*   Jackson, however, was able to use the four statements that had been turned over to attack Clary's credibility.  *Id.*   In those statements, Clary admitted that he had not been truthful when he first talked to the police, when he testified before the grand jury, when he talked to defense counsel, and when he talked to the sheriff on an unspecified occasion. *Id.* at 650.   Clary testified that he provided different accounts of the incident each time that he was interviewed, and that his trial testimony differed from his previous accounts as well.  *Id.*   The prosecution conceded that he had given various stories.  *Id.*   Thus, the four withheld statements by Clary correctly were labeled by the state court as cumulative; they would have had only a cumulative or marginal impact on the jury's credibility assessment; they were not material. *Id.*[16]   There was no reasonable probability, sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different if the evidence had been disclosed to the defense.  *Id.*

### There Is No Requirement That All Police Investigatory Work Must Be Part Of A Complete Accounting

Under *Moore v. Illinois*, 408 U.S. 786, 795, there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the

---

16 *See also*, *United States v. Spence*, 80 F.3d 989, 995-96 (5th Cir. 1996) (evidence cumulative of other impeaching evidence where, *inter alia*, witness was questioned extensively about inconsistencies between his testimony and statements he made to investigators, and witness conceded that portions of his previous statements relating to the murders had not been true).

defense of all police investigatory work on a case."   As  the  district  court  noted,

Vialva "points to no authority which would obligate a government agent to reduce

an interview to a written statement" (R(V). 1, 133).   The district court found that

"the unrecorded and untranscribed statements were described in the Government's

'Final CID Report,' which was not alleged to have been suppressed" (*id*).   The

pre-trial hearing of April 28, 2000, reflects full discovery of materials possessed by

the prosecution (at pp. 7, 33-36, 44-45).

**Evidence From Prior Statements Was Cumulative
Of The Statements Provided; No Additional Statements
Would Have Would Have Put The Whole Case In A Different Light**

Vialva's Contentions As To Impeachment Of Brown
And Lewis By Prior Unrecorded Statements

In his COA request, Vialva argues that the government failed to reveal

unrecorded and untranscribed interviews of Brown and Lewis, which related to

"critical relevant information bearing on the credibility of witnesses" Brown and

Lewis, "the two witnesses on whom the prosecution's case depended," based on the

"absence of forensic evidence" (Vialva's Brief at 28-29).

Vialva points to investigator memos reflecting that: initially Brown's story

was a complete fabrication; Brown sought to minimize his culpability; he denied

seeing who shot the Bagleys; and when Investigator Nelson related new

information, Brown would say he needed time to think about it, and then, upon Nelson's return, Brown would agree with the new information (Brief at 31-33).[17] Later in the interview process, notes indicate that investigators would not then take a written statement from Brown because they believed Brown "was not completely truthful" (Vialva's Brief at 32). This information of prior false statements, however, was essentially known to Vialva's attorneys and they used it effectively in cross-examination and argument to the jury.

Bernard's Contentions As To Impeachment Of Brown
And Lewis By Prior Unrecorded Statements

Like Vialva, Bernard also makes the complaint that agents at one point decided not to "fully memoralize debriefing sessions it conducted with Lewis and Brown" (Bernard's Brief at 73). Again, as discussed above, the information concerning prior false statements was essentially known to Bernard's attorneys, they were in possession of a number of those statements. Additionally, as discussed above, they used the prior inconsistent statements, "lies," and mere agreement with the questions they were asked, effectively in cross-examination and argument to the jury.

---

17    See "Information Disclosed to the Defense Prior to Trial" in Vialva's Motion at 46-49 (R(V). 7, 1006-09).

<u>There Was No *Brady* Violation As To</u>
<u>Prior Statements Of Brown And Lewis;</u>
<u>The Defense Received The Full Impeachment Value</u>
<u>Of Their Initial Prior Inconsistent Statements And "Lies"</u>

Here, the alleged *Brady* material, prior untruthful statements of Brown and Lewis and the possible existence of other post-arrest material, is cumulative of evidence of inconsistent statements and lies told by Brown and Lewis which was effectively utilized by defense counsel.   As in *Jackson*, Brown and Lewis, just like Clary, admitted that they had not been truthful when they first spoke to officers, admitted to providing different accounts of the incident each time that they were interviewed, and their trial testimony differed from their previous accounts.  *See Jackson*, 194 F.3d 648.   Similarly, defense counsel here, as in *Jackson*, sharply called into question the credibility of the witnesses using the prior inconsistent statements.   The additional material here was cumulative.

As discussed in more detail above, in analyzing the ineffective assistance claims as to the impeachment of Brown and Lewis, it was emphasized by both the prosecution and the defense, in both testimony and argument:   that there was little forensic evidence connecting Defendants to the burning car; that the sequence of events of the murders established at trial was based on the testimony of Brown and Lewis; that both Brown and Lewis initially lied as to their involvement and the

94

details of the crime; and that they essentially were agreeing with agents after being confronted with new facts.   Brown and Lewis were relentlessly cross-examined as to their prior inconsistent statements and "lies."   The defense heavily emphasized their prior lies and argued that the jury could not believe the trial version of the events beyond a reasonable doubt. The defense used the impeachment value of the prior statements in making arguments at the penalty stage as well.   Even assuming that there were other prior statements or statements that could have been noted, and assuming that these further statements were completely inconsistent with their trial testimony, the credibility of Brown and Lewis could not have been challenged in a more effective manner as to their prior statements that what was done by defense counsel.

There Was No *Brady* Violation As To
The November 5, Interview

Vialva and Bernard also point to Brown's attorney's notes about an interview on November 5, 1999, in which Brown admitted to certain facts about the offense and disclosed past violent criminal activity.   A *Brady* violation is asserted because "[t]he government was aware Brown's November 5 version in which Bernard threw a match through the front window on the passenger side was in direct conflict with the Fire Marshal's statement the windows were up when the car was on fire"

(Vialva's Brief at 33-34). Brown's trial testimony, however, was: that he and Bernard spread the lighter fluid in the interior of the vehicle (R(B). 19, 1918-20); that he had put lighter fluid on the trunk (*id*. at 1929); that he saw Vialva shoot Mr. Bagley but that he turned away as Vialva shot Mrs. Bagley (*id*. at 1924-25); that he did not actually see Bernard set the car on fire (*id*. at 1926, 1928-29); that after he saw that the car was on fire, he observed Bernard start to run away from the car (1929); that Vialva's position remained behind the trunk of the car (1930); and that, based on the relative positions of the defendants who were not then running down the hill, and the timing, Bernard was the likely starter of the fire (*id*. at 1929-30). Thus, whether there was a prior statement that a match came through an open car door, or another way, is not material, because Brown admitted at trial that he did not see Bernard start the fire and that his prior statements had been lies. The jury decided whether Brown's trial testimony was credible, even in light of his past, extensive, omissions and inconsistencies. These matters would have been cumulative to the impeachment that was performed by the defense teams.

Bernard and Vialva also make the complaint that the information in Brown's debriefing, concerning prior criminal acts, for which he was not arrested or charged, and in a psychiatric report in which he "tended to minimize his wrongdoing and then

to rationalize his behaviors," were the subject of *Brady* violations (Bernard's brief at 74, 76). These claims also are without merit.

In his testimony at the guilt phase, Brown acknowledged that he had pleaded guilty to aiding and abetting the murder of the Bagleys, carjacking and possession of a weapon (R(B). 19, 1857-58). He said he had a prior conviction for a misdemeanor, for which he "went to jail for it and paid a fine" (*id*. at 1859). Brown explained that he, Vialva, Bernard, Lewis, Lynch, Rorie, and Sparks were members of a gang "affiliated with the Bloods" (*id* at 1861, 1863, 1867, 1893). Brown had been initiated into the gang (*id*. at 1861). Previously, before a kind of truce, violence and fights was common between gangs and gang members (*id*. at 1865-66). Fights still occurred if there was "disrespect" between someone and a gang member (*id*. at 1866). Brown agreed that it was common for gang members to commit crimes with other gang members (*id* at 1866-67). Brown possessed the .40 caliber murder weapon before he gave it to Lynch, and he and Bernard previously had fired the weapon (*id* at 1872-73). At the time of the offenses against the Bagleys, Brown was not in school and he did not have a job (*id*. at 1892).

At the punishment phase, Brown testified that he, Bernard, and Vialva committed 25 burglaries together (R(B). 24, 2787). They kicked in the doors of

97

houses (id. at 2788).    Vialva and Bernard pawned the stolen items (*id*. at 2792). Vialva made up T-shirts with the name:    "Kick-Door Boys" (*id* at 2793).

Bernard's *Brady's* contentions that material information was withheld are refuted by the record. Certainly, it is incorrect that he was portrayed by the government as having a "non-violent criminal past" (Bernard's Brief at 74) or "little more than a truant kid" (Bernard's Brief at 78) (Vialva's Brief at 34).   As shown above, Brown was portrayed by the prosecution as a gang member with Vialva and Bernard who had participated in the murders, who would engage in crimes with his fellow gang members, and who would resort to violence based on "disrespect." Bernard did not show that Brown's past criminal activity by his fellow gang member could not have been discovered with reasonable diligence.[18]   More importantly, any

---

18   Additionally, Bernard has not shown a likelihood of admissibility for impeachment of prior acts not resulting in an arrest or conviction. It is not clear that evidence of Brown's uncharged past actions would even have been admissible as impeachment evidence under either Federal Rule of Evidence 609 or 608(b).   Rule 609 only allows evidence of a witness's criminal convictions; and while Rule 608(b) allows questioning on a witness's prior bad acts, including those that did not result in a conviction, it is limited to bad acts that are "relevant to the witness's character for truthfulness." *United States v. Sipe*, 388 F.3d 471, 485 (5th Cir. 2004); Fed. R. Evid. 608(b), 609.

Furthermore, while it is possible that inadmissible evidence could be material under *Brady*, there still must be some evidence that the outcome of the proceeding would have been affected through the suppression of the inadmissible evidence.  *Sipe*, 388 F.3d at 485.  To meet this requirement, the court often looks to whether the inadmissible evidence would have led the defendant to admissible evidence.  *Id.*  The cases in which this has been considered, however, involve situations in which the defendant can point to specific admissible evidence that would have been discovered through the suppressed evidence.  *See, e.g.*, *Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir. 1999) (recognizing that a past arrest, while inadmissible, would have led to admissible impeachment evidence regarding the witness's reputation for dishonesty, but declining to find that it would have put the entire case in a different light sufficient to satisfy *Brady*). In this

additional criminal conduct would have been cumulative and would have had little if any additional impeachment value.  Finally, as the district court noted, questions about Brown's prior burglaries and other gang activity would have weighed against Bernard as a fellow participant.  Counsel's strategy of focusing on the lack of forensic evidence and the blatant prior inconsistent statements was the appropriate strategy.

> There Was No *Brady* Violation As To
> Other Matters Relating To Brown

Bernard also asserts that there was a *Brady* violation as to a mental health evaluation "concluding that Brown tended to minimize his wrongdoing and then rationalize his behaviors" (Bernard's Brief at 76).[19]  As discussed above, Brown was painstakingly impeached with his early versions of the events in which he denied and then minimized his involvement.  It was only when he was confronted with new evidence that he would grudgingly concede new information.  Applicants have not shown the report was available to the prosecution, not turned over to the

---

case, it is hard to see how past, uncharged conduct would relate at all to the truthfulness of Brown, and thus it would likely be inadmissible. Additionally, there was no postulated admissible evidence that could have been discovered based upon the incidents contained in the November 5 conversation.  Mere speculation that some additional impeachment evidence might have been discovered based on inadmissible criminal incidents is insufficient to establish materiality.  *Id.*

19    The redacted Vialva Exhibit III-P and the unredacted government's response to Vialva's section 2255 motion at 91 seem to indicate that the report was not available to any party.

defense, and the defense could not have obtained it with reasonable diligence. Even if these prerequisites were met, this matter was cumulative of other impeachment evidence and not material.

Bernard and Vialva also assert that Brown's use of drugs was the subject of a *Brady* violation. As to evidence of medications in Brown's prison records Applicants have not shown the record was available to the prosecution, not turned over to the defense, and the defense could not have obtained it with reasonable diligence. As to evidence of Bernard's use of illegal drugs, a marijuana cigarette dipped in formaldehyde, the "evidence" of this is Brown's post-convictions declaration in support of his fellow gang member. Nevertheless, on its face, Brown said he was using drugs with Bernard (R(B). 6, 1375). Thus, this information was available to defense counsel. Further, the gang members would be aware of drug use by the members. Finally, at the trial, Lynch testified that Brown was smoking a "blunt," a cigar with marijuana, when Sparks retrieved the Glock from Lynch (R(B). 21, 2187). This information was available to the defense. Other drug use would have been cumulative and not material.

<u>The District Court's Findings And Conclusion</u>

The district court succinctly found the lack of merit and possible prejudice as to the *Brady* claim:

100

In regard to the additional and untranscribed interviews Brown and Lewis had with government agents which contradicted his testimony at trial, these are merely cumulative of the information that was included in their written statements. Reviewing the record it is clear that both of these witnesses originally denied any involvement in the murders. When confronted with contradictory information provided by other witnesses, they eventually truthfully admitted more and more details of the events leading to the murders. Those contradictory statements were fully explored on cross-examination at the time of trial. Defendants fail to explain how any additional contradictory statements could have more effectively impeached these two witnesses. Any additional evidence would not have been material but merely cumulative of the evidence that was disclosed.

(R(B). 8, 117-18).

The district court's assessment of the evidence was not clearly erroneous. Accordingly, it did not abuse its discretion in denying Applicants an evidentiary hearing to find support to validate their allegations. Applicants have not shown that the court's finding of procedural default was incorrect. Applicants have not shown likelihood that favorable evidence was suppressed. Applicants have not shown a reasonable probability that any undisclosed evidence could have had an influence on the outcome of the trial. Applicants have failed to qualify for a COA as to these claims.

101

## (V)4.  VIALVA FAILED TO ESTABLISH HIS *STRICKLAND* CLAIM THAT HIS TRIAL COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE PRIOR TO AND DURING THE GUILT PHASE

(Responsive to Vialva's Brief in Support of COA, Issue 4, 36-46)

### Standards Of Analysis And Review

The standards of analysis and review for these claims are set forth, above, under Bernard's Issue (B)2.

### There Was No Ineffective Assistance

Funding For Experts

In his first claim, Vialva asserts his counsel was ineffective in obtaining money for additional experts, and when funding was obtained, he failed to ask a continuance to better utilize the additional funding (Brief at 38-40). Vialva's counsel engaged the services of a fact investigator, Leon Cheney.  Counsel sought funding in excess of the $7,500 benchmark for other expert services. At pretrial hearing, Mr. Schwieger argued that counsel had consulted the Center," and he believed his request for an additional $40,000 was not unreasonable based on the average funds allocated to the defense in a capital (R(V). 31, 44).  In its section 2255 order, the district court recounted that, this Court remanded for further consideration of additional funding, it

102

"conditionally granted counsel's requests immediately preceding the

of jury selection" (R(V). 1, 152).   The district court correctly determined that

was no ineffective assistance of counsel "merely because they were originally

unsuccessful in their request for financial assistance for experts" (*id*.).   The

court concluded: "Counsel for Vialva did what was required – requesting

for the various areas identified in Defendant's § 2255 motion, for which they

ultimately received approval for payment" (*id*.).   As to the possibility of the

defense asking for a continuance for further time for expert development of facts,

court found that "[i]t is mere supposition that a continuance, if filed, would

been granted" (*id*.).   Vialva has not shown prejudice as to how further expert

resources or testimony would have resulted in a different outcome.

Adequate Investigation

Next, Vialva claims that his counsel failed to conduct an adequate

pretrial investigation (Brief at 40-41).   One of Vialva's lawyers recounted

to the district court what had been undertaken by the defense during the

above pretrial hearing in which the defense was requesting additional funds:

> . . . I am not trying to be unreasonable in . . . making the request
> that I did.   These are the resources that I have seen that have
> been utilized in other courts.   We have proceeded through the
> Government's evidence, which comprised about 18 to 24 inches
> of paper, at this point.   We have [gone] through several

> exhibits. We have compared witness testimony in each and person. We have inspected the crime scene. We have inspected the elements of the crime. We have inspected the vehicle involved in the crime. We have consulted with We have done everything possible or necessary, I believe, in a death penalty case . . . .

(R(V). 31, 44-45).

Vialva challenges counsel's direction of the fact investigator and the forensic consultant, and reiterates that not enough was done to investigate impeachment material for Brown and Lewis (Brief at 41). However, even years after the case, Vialva had not postulated what further investigation or testing would have accomplished. As recognized by the district court, Vialva had the advantage of arguing that little or no forensic evidence connected Vialva to the shooting of the victims. The inconsistent statements and lies of Brown and Lewis were exhaustively emphasized (see the discussion of the cross-examination of Brown and Lewis, and arguments made to the jury about their prior "lies," above, in connection with the *Brady* analysis). Their eyewitness testimony was vigorously challenged. In cross-examination of Brown and Lewis, Vialva's counsel demonstrated a mastery of the details and evolution of their prior statements.

Vialva suggests that further development of the criminal history of Brown and Lewis could have been accomplished. Brown's prior criminal conduct, however, involved dozens of burglaries he committed with Vialva and Bernard. This would not have been a fruitful area of inquiry and would have emphasized Vialva's own prior gang criminal conduct. The jury knew Brown and Lewis were gang members and criminals. It was better to challenge their testimony on the basis of their prior statements. As found by the district court: "The record is clear that counsel for both Vialva and Bernard rigorously cross-examined Lewis. There is, therefore, no basis for a claim of ineffective assistance of counsel in this regard" (R(V). 1, 158).

Vialva also suggests that evidence could have been developed that he was not the leader of the gang. However, in addition to the testimony of Brown and Lewis, other witnesses corroborated this evidence. Lynch testified that Vialva said he wanted the .40 caliber gun because he was on a "mission to make money" (R(B) 21, 2185). As to Vialva's supposed mental inability to be the leader, as the district court found, "It did not take sophisticated or intricate planning to complete the carjacking and the murder in this case" (R(V). 1, 153).

<u>Adversarial Testing And
Presentation Of A Defense;</u>

Under the next group of claims, Vialva complains of the "failure" to present a "coherent defense" at the guilt phase, the "failure" to subject the government's case to adversarial testing (Brief at 41-44), and of outcome-changing prejudice as to his perceived failures of effective assistance of counsel at the guilt phase (Brief at 44-46).

As to a possible defense, even years after the crime, Vialva does not propose a viable defense. As the district court noted, " 'it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy' " (R(V). 1, 159) (quoting *Richter*, 131 S.Ct. at 791). "To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates" (*id.* quoting *Richter* at 790).

The court correctly determined:

> It is clear in this case that counsel for both Defendants had little defense other than vigorously challenging the Government's case and attempting to establish that the Government had not proved the Defendants' guilt beyond a reasonable doubt. There is, therefore, no basis for Defendants' claims regarding a lack of a coherent defense theory.

(R(V). 1, 153).

106

As argued to the jury many times by Vialva's counsel, the government's entire case "revolve[ed] around the believability of Mr. Brown and Mr. Lewis," and that when you examine the prior statements and testimony of Brown and Lewis "we see lies, we see inconsistencies, but most of all, as they testified before you, they changed their testimonies to match each other" (R(B). 23, 2614, 2626). As noted above, Vialva's counsel, Mr. Goains, summarized: "Terry Brown stated it the best ... I asked him, "is this your statement?" he said, "They put it together; I signed it" (*id* at 3631). The challenges as to inadequate impeachment of Brown and Lewis, and an inadequate defense strategy, are conclusively refuted by the record.

Vialva's defense team conducted a reasonable investigation. Except for DNA evidence from the ski mask, there was no fingerprint or other traceable forensic evidence. The district court was correct that Vialva's counsel's approach of exploiting the prior misstatements of the key witnesses and emphasizing the lack of forensic evidence was the best possible strategy under the circumstances in the guilt phase. Nevertheless, Vialva has not even approached the threshold of prejudice.

### There Was No Strickland Prejudice

Vialva, Bernard, and the other gang members were apprehended yards away from the victims, who had been shot and immolated. An abundance of evidence collected at the scene, and recovery of items taken from the Bagleys, connected the

107

gang members to the carjacking and the crimes. As to the *Strickland* prejudice with regard to the guilt phase, the district court was correct that "the evidence against the Defendants was overwhelming" and Vialva "failed to establish either ineffectiveness or prejudice" (R(V). 1, 144, 153, 168).

### (V)5.    VIALVA FAILED TO ESTABLISH HIS *STRICKLAND* CLAIM THAT HIS TRIAL COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE PRIOR TO AND DURING THE PENALTY PHASE

(Responsive to Vialva's Brief in Support of COA, Issue 5, 46-59)

### The District Court's Summary

In its order denying section 2255 relief, the district court recounted that Vialva raised the following mitigating factors:

> (1) he was subjected to emotional and physical abuse as a child, and was deprived of parental guidance and protection; (2) he has responded well to structured environments in the past; (3) he was 19 at the time of the offense; (4) another defendant or defendants who may be equally culpable in the crime will not be punished by death; (5) any other factors in his background, record or character or any other circumstances of the offense that may mitigate against the imposition of the death sentence.

(R(V). 1, 112).

As noted above, the district court found that "counsel for Vialva and Bernard took separate paths during the punishment phase" (*id.* at 159). Vialva's lawyers chose to portray Vialva as a "broken vessel" which was: the product of an

108

abusive home, and having Attention Deficit Disorder (*id*.). The court determined that this strategic choice was not subject to an ineffective assistance claim (*id*.).

## There Was No Ineffective Assistance

<u>Recognizing The Importance Of Mitigation;</u>
<u>Obtaining Mitigation Evidence</u>

In his first claims under this issue, Vialva asserts his counsel failed to recognize the principles and importance of mitigation (Brief at 48-50). Vialva refers to the affidavit of Richard Burr, who indicates he had tried three capital cases, had participated in some way in more than one-hundred capital cases, had led the failed mitigation and punishment-phase effort in the Timothy case, and had been designated as capital resource counsel (R(V). 7, 1144)   Mr. Burr gave his opinion that he would not have recommended the appointment of either Mr. Goains or Mr. Schweiger based on their experience and quality of work in death penalty cases (*id*. at 1146).   Mr. Burr further opined that Mr. Goains delegated to Mr. Schweiger the primary responsibility of the phase presentation based on his very limited contact with Mr. Goains.[20]   This claim is without merit.   As noted above, Mr. Goains was a Board Certified

---

[20] Mr. Burr did acknowledge and recount discussions with Mr. Schwieger concerning:  "the Department of Justice authorization process, various funding issues, his mandamus petition to the Fifth Circuit concerning inadequate funding of the mitigation investigation, jury selection matters, opening statements and closing arguments in the penalty phase, and penalty phase jury instructions" (*id*. at 1148).

Criminal Lawyer, who had tried eight capital murder cases. His presentation to the jury was vigorous in both the guilt and penalty stages. Certainly, a delegation of responsibilities within the defense team did not constitute ineffective assistance.

Vialva also argues that counsel was ineffective for failing to obtain adequate funding for further work by Ms. Francis, who is acknowledged to be a qualified mitigation specialist. As the district court noted, "Vialva's defense team the services of Ms. Francis as a mitigation expert who was paid $5,760 and was authorized an additional $3,000. Vialva also had the assistance of Dr. Cunningham, who testified longer than any witness during the penalty phase" (R(V). 1, 163). Mr. Schwieger requested an additional $15,000 for Ms. Francis.[21] It was not ineffective assistance of counsel for Vialva's defense team to seek additional funds.

In *Moore v. Reynolds*, 153 F.3d 1086, 1098-99 (10th Cir. 1998), it was argued that counsel was ineffective at the penalty stage by not consulting and presenting a mental health expert. The court found no ineffective assistance, explaining:

---

21 Vialva's defense team sought additional funds:  $4,500 for a "neuropsychiatrist" (granted by the court); $1,500 for the pathologist (granted by the court); $1,000 for the crime scene expert (granted by the court); $15,000 for Francis, the mitigation expert (who had already been paid approximately $6,000 (the court granted $3,000) (R(V). 15, 3-7).

As for evidence of Moore's alleged mental health problems, we seriously question whether Whittaker can be charged with negligence in failing to discover and present such evidence. As outlined in greater detail below, Whittaker filed a motion for funds to hire a mental health expert, but the trial court denied that request. Moore offers no explanation in his habeas petition concerning how Whittaker could have discovered and presented this information without receiving the requested funds.

Id. at 1099 (later ruling that failure by the court to appoint a mental health expert was harmless error). Here, the failure to persuade the district court for greater sums of money was not ineffective assistance.

The district court listed 13 mitigation areas in which Vialva claimed in his section 2255 motion that further funding and investigation would have discovered (*id*. at 164). The district court found, however, that many of these matters were, in fact, presented by the testimony of witnesses called by the defense and by Dr. Cunningham (*id*. at 165).

As recounted by the district court, at the punishment phase, Vialva's mother "gave a detailed description of their chaotic home life and her history of being abused by Vialva's father, her second husband" (*id*. at 165-66). His mother discussed how they both suffered abuse from her first husband who reconnected with after leaving Vialva's father (*id*). Her virtual of Vialva was set forth (*id*.). She described her series of disruptive

111

relationships ("Vialva would become accustomed to one step-father [and] another would move in"), Vialva's problems in school, his ADHD, his "problems with his racial identity,"[22] and stopping his medication because of complications (*id.*).

At the punishment phase, Dr. Cunningham consulted with and referred to Vialva's educational records, psychological records, medical records, juvenile and adult offense records, and other records (R(B). 25, 2968).[23] He discussed mitigating factors.

Dr. Cunningham described Vialva's violent and chaotic home life; his mother's physical problems; his mother's absence from his life resulting from her jobs and pursuit of romantic relationships; his exposure to domestic violence because of her relationships; and his family's history of substance abuse and criminal behavior (R(V). 1, 166). Dr. Cunningham "discussed the presence of mild physical abnormalities or brail damage" (*id*). He said that Vialva had not been disciplined, nor had appropriate limits been set for him (*id.*). He testified about

---

22  At school, the other kids cruelly called Vialva "zebra" (R(B). 25, 2949).

23  As Dr. Cunningham explained to the jury, not interviewing Vialva was a deliberate choice ("By not having spoken to him directly, there is a certain objectivity, at least in terms of this is entirely based on what's in the records and what's described by third parties and is not based on his personal report that might be looked upon more skeptically" (R(B). 25, 2970).

Vialva's ADHA, characterized as a mild brain disorder, and his treatment problems (*id.*).

As the district court found, Dr. Cunningham also identified emotionally damaging factors to Vialva, including:

> multigenerational family distress; rejection and abandonment from his father and stepfathers; his emotional development was disrupted by ADHA; he had emotional disturbances or psychological disorders, as well as head injuries; he observed domestic violence; he had identity confusion; and disrupted attachments damaging his ability to bond with others and value other people.

(*Id.*).

The defense, through Dr. Cunningham, identified Vialva's healthy attributes (R(B). 25, 3069-70). Vialva finished high school despite his many hurdles. He continued to be bonded to his mother, despite the problems that her parenting had created. He was protective of his younger sister. And Vialva had a long-term relationship with his girlfriend.

Additionally, as also described by the court, Dr. Cunningham presented statistical models to counter the government's testimony regarding future dangerousness (*id.*). Dr. Cunningham discussed a study which had reached the "important finding" that "the severity of the current offense did not predict inmate

violence," or predict disciplinary problems in prison (R(B). 25, 2999, 3001).[24]   He

presented a violence risk assessment as well as a summary of adverse developmental

experiences and factors that interfered and damaged Vialva's development (R(B).

25, 2968-69).   As the district court found, Dr. Cunningham "presented strong

evidence of Vialva's physical problems and chaotic and abusive home life" (R(V).

1, 167).[25]

Vialva seems to argue that because Dr. Cunningham conceded negative facts

and factors that choosing to present his testimony was unsound strategy by his

counsel.[26] The expert's concessions, however, made his presentation all the more

believable. Vialva cites to one question on cross-examination in which Dr.

Cunningham agreed that he would not want to be in a jail cell with Vialva (Brief at

---

24  On cross-examination, Dr. Cunningham described rehabilitative effects of the penitentiary in which past characteristics stop causing behavioral problems as inmates grow older.   He discussed the availability in prisons of medications, counseling support, and "a significant degree of internal structure, which he has not had up till now" (R(B). 25, 3078).

25  Vialva argues that retention of Dr. Cunningham was itself ineffective assistance based on other opinions questioning the legitimacy of his analytical methods.   Dr. Cunningham, however, was then, and is now, a very well respected mitigation expert in capital litigation.   At the time of his testimony, he was a board certified forensic pathologist, a Diplomate of the American Board of Professional Psychology (one of only nine in Texas), and had testified in numerous capital cases (R(B), 25, 2963). Recently, in an amicus brief before the Supreme Court, filed on July 29, 2013 by the ACLU (2013 WL 4011033 (U.S.)), in *Kansas v. Cheever*, No. 12-609, fifteen articles are cited as to mitigation doctrine; three of the articles are authored or co-authored by Dr. Cunningham.

26  Counsels' decisions were the product of strategic choice.   As Vialva acknowledged, another expert, and psychiatrist, who prepared a report, was not presented as a witness because of his negative findings.

114

55).   In his complete answer, however, he emphasized that based on his scientific studies, he "might take him [as a cellmate], as opposed to a property offender, or someone else who worked themselves up to a USP by their violence record" (R(B). 25, 3081-3082).

Dr. Cunningham's methods and presentation had been made in many capital cases at the time of his retention by Vialva's defense team.   It was not a misuse of experts or objectively unreasonable to retain and utilize his services.[27]

Additionally, the district court correctly rejected the allegation that counsel failed to document neurological and developmental issues that would have "rebutted" the contention that he was the leader of the gang. The district court correctly found that:

> There was nothing in the crime that required lengthy premeditation or intricate planning.   In fact, it was the lack thereof that led to the Defendants' arrest and eventual conviction. But, lack of detailed planning on the part of the Defendants does not necessarily indicate a lack of maturity or intelligence.   There was sufficient planning on Vialva's part to override an expert's opinion regarding his "cognitive" disorders and possible poor impulse control. It did not take sophisticated or intricate planning to complete the carjacking and the murder in this case. Vialva was able to control his impulses long

---

27   Vialva cites only to a district court case in which Dr. Cunningham testified at the penalty phase and the district court subsequently ordered a new trial on the penalty phase (Brief at 55).   On appeal of this case, however, the Eighth Circuit reversed the district court, finding no error. *United States v. Lee*, 274 F.3d 485, 495-96 (8th Cir. 2001) (commenting that Dr, Cunningham was "a mental health expert" who provided relevant testimony).

enough to carjack the Bagleys, take their valuables, obtain his ID, attempt to pawn their valuables, and carry out their execution.

R(V). 1, 153).

Arguing For Individualized
Sentencing Proceeding

Vialva also argues that his counsel was constitutionally ineffective for failing to effectively advocate for an individualized sentencing proceeding (Brief at 56-57). As Vialav concedes, however, his counsel moved in a pretrial motion for a separate penalty phase (R(V). 4, 420-38). In an emphatic memorandum supporting his motion, counsel made an 18-page argument, citing a multitude of cases, and warned that "at a joint penalty hearing [the jury] will compare and contrast both mitigating and aggravating factors as to each defendant in arriving at sentencing decisions for the entire group" (*id*. at 433). Counsel pointed out the various potential distortions from a joint proceeding (*id*. at 434). The court denied the motion.

Vialva's counsel renewed the motion at the end of jury selection (R(V). 21, 1452), and at the beginning of the penalty phase (R(V). 28, 2708-09). The court denied the two additional motions (R(V). 1, 144).

Vialva argues that after taking three strikes – failing three times – counsel should have done something more. Vialva suggests that, instead of the cases that were cited, empirical evidence may have changed the court's mind. This

116

speculation is entirely unwarranted. Counsel made repeated efforts to obtain separate sentencing proceedings. As this Court noted, the Federal Death Penalty Act contains no special rules regarding joinder of codefendants, and defendants charged with capital murder under federal statutes have been tried jointly in both the guilt and penalty phases of trial. *Bernard*, 299 F.3d at 475 & n.5 (citation omitted). After acknowledging As the district court found, Vialva failed to establish that his counsel were ineffective as to their arguments for severance (R(V) 1, 147).

### There Was No Strickland Prejudice

As discussed above, Vialva's counsel's penalty phase argument highlighted Vailva's educational, social, medical, and emotional history. As the district court found, the additional experts and evidence he now suggests would have been cumulative of what was presented. Even if counsel's argument was imperfect, there was no reasonable probability that a different mitigation presentation would have resulted in a different outcome. As the district court found,

> The evidence against the Defendants was overwhelming. It was established that Vialva was the ringleader of the operation. He decided that the Bagleys had to be killed because they had seen his face. He was the one who decided to burn the vehicle. He was the one who mercilessly shot the Bagleys in their heads after they begged for their lives. The murders were committed in a terrible manner, as a continuation of the carjacking and robbery of the Bagleys. The murders were committed after substantial planning (although it may

not have been very effective or intelligent planning) in order to cover-up the crimes from law enforcement.

(R(V). 1, 168).

The district court further recounted that at the punishment phase there was evidence; that Vialva was affiliated with a violent street gang; he committed dozens of burglaries with Bernard and Brown; he was in a car with other gang members when one of them killed a man in a "road rage" encounter; and "he had a history of violence from which the jury was entitled to find that he would constitute a continuing danger" (*id.*).

This was not a case where the weight of the aggravating circumstances or the evidence supporting them was weak. There was no *Strickland* prejudice; no reasonable probability of a different outcome at the punishment phase.

## 6(V).   VIALVA'S CUMULATIVE-ERROR CLAIM IS WITHOUT MERIT

(Responsive to Vialva's Brief in Support of COA, Issue Six, 59).

Vialva argues under this section that a COA should issue as to his claim that cumulative error deprived him of due process and a fair trial. In *Derden v. McNeel*, 978 F.2d at 1461, this Court, in denying habeas relief, observed that even if there were errors, they did not cumulatively so infect the trial with unfairness so as to deny due process. This Court has "repeatedly emphasized that the cumulative error

118

doctrine necessitates reversal only in rare instances . . . and the possibility of cumulative error is often acknowledged but practically never found persuasive." *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (*en banc*) (citing *Derden*, 978 F.2d at 1456) (footnote omitted). Its application is especially uncommon where the government presented substantial evidence of guilt. *Id.* Here, there was overwhelming evidence of guilt and there were no errors that cumulatively infected the trial with unfairness so as to deny due process.

## 7(V).   VIALVA'S *ROPER-SIMMONS* CLAIM IS WITHOUT MERIT

(Responsive to Vialva's Brief in Support of COA, Issue Seven, 59-61).

Vialva argues under this section that a COA should issue as to his claim that his sentence of death should be vacated in light of the Supreme Court opinion in *Roper v. Simmons,* 543 U.S. 551 (2005), wherein the majority ruled the Eighth and Fourteenth Amendments prohibited the execution of defendants who are under the age of 18 when they committed the capital offense. Although Vialva was 19 at the time he murdered the Bagleys, he argues that his mental age at the time was much younger and that standards are or should be continuously evolving. The district court was correct that Vialva's argument was procedurally defaulted. Nevertheless, Vialva's arguments have been considered and rejected the courts.

119

Recently, in *Doyle v. Stephens*, 2013 WL 3456782 (5th Cir. July 10, 2013), the capital defendant sought a certificate of appealability on the ground that his death sentence violated the Eighth and Fourteenth Amendments because, though legally an adult, he was developmentally a juvenile at the time of the offense. *Id.* at 2. This Court denied the COA request, stating that by arguing that the Eighth Amendment prohibits applying the death penalty to one who is "developmentally" a minor, the defendant was asking the Court "to ignore clear Supreme Court precedent and inaccurately present[ing] Eighth Amendment jurisprudence." *Id.* at 4. This Court also rejected the defendant's argument that, in spite of *Roper*, the Eighth Amendment forbids bright-line rules, stating that the defendant "was over eighteen, so he cannot use [*Roper*] as a shield" and that the defendant "has not shown that he was denied a constitutional right, and there is no room for reasonable jurists to debate." *Id.*

Similarly, in *Jasper v. Thaler*, 466 Fed.Appx. 429, 438 (5th Cir. 2012) (unpublished), the defendant requested a COA for numerous alleged errors including ineffective assistance of counsel for failure to raise the defendant's immaturity during sentencing. For support, the defendant cited to the proposition in *Roper* that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Id.* at 438 (quoting *Roper*, 543 U.S. at 574). This

120

Court rejected this argument, stating that, *inter alia*, the defendant was over the age of eighteen at the time he committed the murder so *Roper* was inapplicable on its face. *Id*. (*see also In re Garner*, 612 F.3d 533, 534-35 (6th Cir. 2010) (rejecting motion to stay execution based on *Roper* founded on argument that although chronologically Defendant was nineteen, and so an adult, at the time of the offense, developmentally, he was like a fourteen-year old).

This recent capital jurisprudence makes clear that Defendant Vialva's argument that his death sentence is constitutionally infirm under *Roper* lacks legal grounding and, in fact, has specifically been rejected by courts that have considered it.

## CONCLUSION

For the foregoing reasons, the Applications for COA should be denied.

Respectfully submitted,

ROBERT PITMAN

By:    /s/ JMark R. Stelmach
Mark R. Stelmach
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Consolidated Brief for the United States of America has been electronically filed with this Court's Clerk of Court using the CM/ECF system, which will send notification for such filings to all attorneys of record, on this the 26th day of November, 2013.

/s/ Mark R. Stelmach
Mark R. Stelmach
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7090

122

## CERTIFICATE OF COMPLIANCE

This brief is in excess of the word limitation. A motion to file a brief in excess of the word limit has been filed.

PLACE THIS AS LAST DOCUMENT IN BRIEF BEFORE THE BACK COVER

Pursuant to 5th Cir. R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of 5th Cir. R.32.2.7(b).

1. EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5th Cir. R. 32.2.7(b)(3), THE BRIEF CONTAINS (select one):

    A.       27,490       words, OR
    B.      _____ lines of text in monospaced typeface.

2. THE BRIEF HAS BEEN PREPARED (select one):
    A.    in proportionally spaced typeface using:
        Software Name and Version:   Microsoft Word 2010
        in (Typeface Name and Font Size): Times Roman 14 pt., OR
    B.    in monospaced (nonproportionally spaced) typeface using:
        Typeface name and number of characters per inch:

3. THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION COMPLETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN 5th Cir. R. 32.2.7, MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

*s/ Mark R. Stelmach*
Mark R. Stelmach.
Assistant United States Attorney