No. 13-70013

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA
*Plaintiff-Appellee,*

v.

BRANDON BERNARD,
*Defendant-Appellant.*

## CONSOLIDATED WITH 13-70016

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

CHRISTOPHER ANDRE VIALVA
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas at Waco

## DEFENDANT-APPELLANT BRANDON BERNARD'S CORRECTED REPLY BRIEF IN SUPPORT OF APPLICATION FOR CERTIFICATE OF APPEALABILITY

Robert C. Owen
Bluhm Legal Clinic
Northwestern University School of Law
375 East Chicago Avenue
Chicago, IL  60611
Phone: (312) 503-0135
Email:Robert.Owen@law.northwestern.edu

John R. Carpenter
Asst. Federal Public Defender
1331 Broadway, Suite 400
Tacoma, Washington  98402
Phone: (253) 593-6710
Email: John_Carpenter@fd.org

## TABLE OF CONTENTS

Table of Authorities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Because the District Court clearly erred in denying a
      hearing, this Court should grant COA and order a hearing.
      Alternatively, it should grant COA on all claims . . . . . . . . . . . . . . 2

III.  Systemic errors infected the District Court's analysis of each
      claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    There is no evidence that any of trial counsels'
            challenged actions were actually strategic  . . . . . . . . . . . . . . 3

      B.    Bernard's allegations have extensive record support  . . . . . . 6

      C.    The District Court applied an incorrect legal
            standard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.   Bernard's IAC and *Brady* claims each warrant remand for a
      hearing or, at a minimum, a COA . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.    Discovery and a hearing were warranted on
            Bernard's IAC claim regarding counsels' failure to
            challenge the source of the fire and its impact on
            Stacie Bagley's death  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.    Counsel's pretrial negotiations with the DOJ
            were deficient, and reasonable performance might
            have produced a different result  . . . . . . . . . . . . . . . . . . . . 14

C.   A reasonable jurist could find Bernard's counsel
     ineffective for failing to develop and present the
     wealth of available mitigating evidence  . . . . . . . . . . . . . . . 16

     1.   The Government fails to cite, much less
          distinguish, *Sears v. Upton*, 130 S. Ct. 3259
          (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     2.   The jury knew nothing of the turbulence in
          Bernard's home environment . . . . . . . . . . . . . . . . . . . 20

     3.   No evidence supports the speculation that
          counsels' failure to investigate or present
          evidence of Bernard's cognitive impairment was
          "strategic." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     4.   Counsel's failure to develop and present readily
          available *Skipper* evidence prejudiced Bernard  . . . . 22

     5.   Counsel performed deficiently in making no
          attempt to account for Bernard's involvement in
          the crime  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

     6.   Counsels' failure to seek a limiting instruction
          concerning Dr. Coons' future dangerousness
          predictions harmed Bernard . . . . . . . . . . . . . . . . . . . 25

D.   Denying discovery and an evidentiary hearing on
     Bernard's *Brady* claims was error . . . . . . . . . . . . . . . . . . . 25

     1.   The Government's attempts to block
          development of Bernard's *Brady* allegations
          lack legal support  . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2.   The specific *Brady* violations require
remand for an evidentiary hearing, or at
least a COA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

a.   Impeachment of Terry Brown regarding the
source of the fire . . . . . . . . . . . . . . . . . . . . . . . . 27

b.   Brown's criminal history . . . . . . . . . . . . . . . . . . 31

c.   Brown's mental illness . . . . . . . . . . . . . . . . . . . . 34

V.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

iii

# TABLE OF AUTHORITIES

### SUPREME COURT CASES:

*Banks v. Dretke*,
     540 U.S. 668 (2004) ..................................................... 26, 27, 33, 35

*Brady v. Maryland*,
     373 U.S. 83 (1963) .................................... 8, 9, 25-29, 31, 32-34, 36

*Harrington v. Richter*,
     131 S. Ct. 770 (2011) ......................................................................... 4

*Miller-El v. Cockrell*,
     537 U.S. 322 (2003) ........................................................................... 2

*Napue v. Illinois*,
     360 U.S. 264 (1959) ......................................................................... 37

*Porter v. McCollum*,
     558 U.S. 30 (2009) ........................................................................... 25

*Sears v. Upton*,
     130 S. Ct. 3259 (2010) ........................................... 17, 18, 19, 20, 24

*Skipper v. South Carolina*,
     476 U.S. 1 (1986) ................................................................. 22, 23, 24

*Strickland v. Washington*,
     466 U.S. 688 (1984) ................................................................. 3, 8, 24

*Strickler v. Greene*,
     527 U.S. 263 (1999) ................................................................... 26, 27

*Wiggins v. Smith*,
     539 U.S. 510 (2003) ....................................................................... 4, 20

iv

*Williams v. Taylor*,
    529 U.S. 362 (2000) .................................................................. 4, 20


FEDERAL APPELLATE COURT CASES:


*Aron v. United States*,
    291 F.3d 708 (11th Cir. 2002) ......................................................2

*Burns v. Mayes,*
    369 F. App'x. 526 (5th Cir. 2010) ............................................... 35

*East v. Johnson*,
    123 F.3d 235 (5th Cir. 1997) ..................................................... 38

*Enying Li v. Holder*,
    __ F.3d __, 2013 WL 6851028 (9th Cir. Dec. 31, 2013)................. 30

*Graves v. Cockrell*,
    351 F.3d 143 (5th Cir. 2003) ..................................................... 26

*Graves v. Dretke*,
    442 F.3d 334 (5th Cir. 2006) ..................................................... 27

*Hooks v. Workman*,
    689 F.3d 1148 (10th Cir. 2012) .................................................. 24

*Johnson v. Dretke*,
    394 F.3d 332 (5th Cir. 2004) ..................................................... 26

*Martinez v. Dretke*,
    404 F.3d 878 (5th Cir. 2005) ..................................................... 22

*Moore v. Johnson*,
    194 F.3d 586 (5th Cir. 1996) ..................................................... 23

*Moore v. Sec'y Pa. Dep't of Corr.*,
    457 F. App'x. 170 (3d Cir. 2012) (unpublished).............................. 8

*Rose v. Lee,*
        252 F.3d 676 (4th Cir. 2001) ........................................................ 8

*Taylor v. Charter Med.Corp.,*
        162 F.3d 827 (5th Cir. 1998) ..................................................... 35

*Trottie v. Stephens,*
        720 F.3d 231 (5th Cir. 2013) ....................................................... 8

*Tucker v. Johnson,*
        242 F.3d 617 (5th Cir. 2001) ....................................................... 6

*United States v. Bartholomew,*
        974 F.2d 39 (5th Cir. 1992) ..................................................... 5, 6

*United States v. Bernard,*
        299 F.3d 467 (5th Cir. 2002) ..................................................... 25

*United States v. Bourgeois,*
        2013 WL 3972699 (5th Cir. 2013) (unpublished) ........................... 5

*United States v. Hall,*
        455 F.3d 308 (5th Cir. 2006) ....................................................... 4

*United States v. Jackson,*
        636 F.3d 687 (5th Cir. 2011) ................................................. 3, 4, 7

*United States v. Kohring,*
        637 F.3d 895 (9th Cir. 2011) ..................................................... 35

*United States v. Santiago,*
        46 F.3d 885 (9th Cir. 1995) ....................................................... 37

*United States v. Sipes,*
        388 F.3d 471 (5th Cir. 2004) ..................................................... 30

*United States v. Wilson,*
237 F.3d 827 (7th Cir. 2001) ........................................................ 36

*Walbey v. Quarterman,*
309 F. App'x. 795 (5th Cir. 2009) (unpublished) ............... 19, 20, 23


### FEDERAL DISTRICT COURT CASES:

*United States v. Atwater,*
No. 1:08CR384-1 (M.D. N.C) ........................................................ 15

*United States v. Dennis,*
Crim. No. 3:96CR66-05 (E.D. Va.) ............................................... 24

*United States v. Jones,*
Crim. No. 3:97CR169 (E.D. Va.) ................................................... 24


### STATE CASES:

*Commonwealth v. Collins,*
888 A.2d 564 (Pa. 2005) .............................................................. 17

*Ex parte Gonzales,*
204 S.W.3d 391 (Tex. Crim. App. 2006) ...................................... 17

*Hall v. McPherson,*
663 S.E.2d 659 (Ga. 2008) ........................................................... 17


### FEDERAL STATUTES:

Title 18, United States Code,
Section 3592(a)(4) ........................................................ 32
Section 3593(c) ............................................................. 32
Section 5032 ................................................................ 34

Title 28, United States Code,
     Section 561(a) ............................................................................. 36
     Section 2255 ................................................................................. 6


## RULES:


Federal Rules of Evidence,
     Rule 201 ..................................................................................... 35


## MISCELLANEOUS:


*Bourgeois v. United States*,
     No. 11-70024 (5th Cir.), Brief of Respondent-Appellee ................... 5

Sarah Frier, "Death Penalty Dropped for Atwater in Eve Carson
     Case, The Daily Tar Heel (April 20, 2010) ..................................... 15

Suzan Clarke, "UNC Student Eve Carson Begged Captors to Pray
     With Her Before They Killed Her, Says Murder Trial
     Witness," ABC News (December 14, 2011)(available at
     http://abcnews.go.com/blogs/headlines/2011/12/unc-student-
     eve-carson-begged-captors-to-pray-with-her-before-they-
     killed-her-says-murder-trial-witness/) .......................................... 16

## I.     Introduction

Brandon Bernard faces execution for crimes that occurred when he was only eighteen.  He did not originate the plan that led to the Bagleys' deaths; he did not abduct them nor fire the shots that killed them.  He had no prior violent criminal history.  He was nevertheless condemned because (1) the Government led jurors to believe that he lit the fire that engulfed the Bagleys' car and that this fire tortured Stacie Bagley, and (2) his own lawyers presented a grossly deficient case for sparing his life.  Despite the Government's concealing impeaching information about its witnesses and Bernard's lawyers' omitting important mitigating information about him, the jurors struggled to decide Bernard's sentence.[1]

Bernard's specific allegations – supported with documentary evidence, including sworn declarations from lay witnesses and experts alike – directly undermine the support for his death sentence.  A

---

[1] Jurors sentenced Bernard to death on only one count, taking time to do so, while immediately sentencing Vialva to death on all three counts.  Deliberations began around 4:15 p.m. on June 12; jurors apparently worked until about 7:00 p.m.  ROA.13-70013.v2.297;v5.1038;v26.3278.   On that first day, jurors imposed all three of Vialva's death sentences *and* Bernard's two life sentences.   ROA.13-70013.v2.318;v2.331;v2.344;v2.358;v2.371.   Deliberations continued on June 13.  ROA.13-70013.v5.1040.   Only after those further deliberations did jurors finally reach their sole death verdict regarding Bernard.  ROA.13-70013.v2.383.

reasonable jurist could find that the District Court erred in denying relief while refusing Bernard any opportunity to prove those facts. A COA should issue.

## II. Because the District Court clearly erred in denying a hearing, this Court should grant COA and order a hearing. Alternatively, it should grant COA on all claims.

This Court cannot undertake even a "preliminary" examination of Bernard's claims, *see Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), because the District Court's clear error in denying a hearing has left the record full of unresolved factual disputes. Bernard's allegations were neither "affirmatively contradicted by the record" nor "patently frivolous." *Aron v. United States,* 291 F.3d 708, 715 n.6 (11th Cir. 2002). Yet, without allowing Bernard to call a single live witness, the District Court resolved factual disputes, determined credibility, weighed evidence, and denied relief. That plain abuse of discretion makes this Court's path clear: it should grant COA on this issue and order a hearing without addressing the other issues presented. But if the Court is not yet convinced that a hearing is required, it must issue a COA on each claim.

2

III.  **Systemic errors infected the District Court's analysis of each claim.**

The District Court asserted that "many of the challenged actions [of counsel] fell within the categories of strategy and tactics or were otherwise objectively reasonable," that Bernard's IAC claims were "speculative and conclusory," and that Bernard failed to show "outcome changing prejudice."  GB.19-20.  The first conclusion lacks any supporting evidence, the second ignores evidence that contradicts it, and the third is contrary to *Strickland.*  Because it denied a hearing "based on an erroneous view of the law [and] a clearly erroneous assessment of the evidence," the District Court abused its discretion. *See United States v. Jackson,* 636 F.3d 687, 692 (5th Cir. 2011).

A.  **There is no evidence that any of trial counsels' challenged actions were actually strategic.**

The Government repeatedly attributes trial counsels' acts and omissions to "strategy."  *E.g.,* GB.19,57,99,107.  But the record contains no evidence from counsel (*e.g.,* affidavits, depositions, or testimony) explaining their actions, nor any other evidence from any source defending their performance.  Moreover, all available evidence indicates that counsel failed to conduct a thorough investigation, a prerequisite

3

for genuinely strategic decision-making. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (no deference to counsels' decisions regarding mitigation case unless counsel "fulfill[ed] their obligation to conduct a thorough investigation of [their client's] background") (citation omitted); *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (same); ROA.13-70013.v5.914-950,964-1014;BBOB.12.    On this record, denying a hearing on the speculative assumption that counsels' decisions reflected a particular "strategy" was an abuse of discretion. *See Jackson*, 636 F.3d at 692; *Harrington v. Richter*, 131 S. Ct. 770, 790 (2011) (reviewing courts "may not indulge '*post hoc* rationalization' for counsel's decision-making that contradicts the available evidence") (citation omitted).

This absence of evidence distinguishes the Government's cases. For example, the Government cites *United States v. Hall*, 455 F.3d 308 (5th Cir. 2006). GB.20-23. But the record in *Hall* contained affidavits from counsel describing their investigation and other documents showing that counsel possessed the information Hall accused them of failing to develop. *Hall*, 455 F.3d at 518-19 and n.9. Thus, *Hall* illustrates that resolving an IAC claim requires a full record of counsels'

4

actions and rationale – and highlights the District Court's error in refusing a hearing here.

The Government points to *United States v. Bourgeois*, 2013 WL 3972699 (5th Cir. 2013) (unpublished), which "affirmed the denial of ... a full hearing" as to one aspect of Bourgeois' IAC claim.  GB.23.n.4. But more important, the District Court permitted full development of Bourgeois' *other* IAC allegations – holding a four-day evidentiary hearing and "generously and repeatedly" giving Bourgeois additional opportunities to "present evidence and make a complete record," including depositions.  Brief of Respondent-Appellee, *Bourgeois v. United States*, No. 11-70024 (5th Cir.) at 8.  Nothing in *Bourgeois* endorses what the District Court did here.

Nor does *United States v. Bartholomew*, 974 F.2d 39 (5th Cir. 1992), GB.23, help the Government.  There, the sentencing transcript refuted Bartholomew's claim that counsel hadn't investigated his mental health.  974 F.2d at 42.  Another claim failed because the court credited Bartholomew's admissions in pleading guilty over a prisoner's conflicting hearsay affidavit.  *Id*.  Bartholomew's attack on counsel's plea advice was insufficiently specific.  *Id*.  And counsel's failure to

review the PSI was harmless even if deficient, because the court had based Bartholomew's sentence exclusively on the facts of the crime as admitted in the plea. *Id.* Because Bartholomew's claims were refuted by the record or otherwise incredible, no hearing was necessary. *Id.* Bernard's IAC claims – detailed, specific, and supported by extensive evidence – could not be more different.

Finally, *Tucker v. Johnson*, 242 F.3d 617 (5th Cir. 2001) is a fact-specific *merits* appeal involving neither application of the COA standard nor interpretation of 2255's hearing requirement. GB.24. It has no bearing on the issues currently before this Court.

## B. Bernard's allegations have extensive record support.

While lacking any evidence that trial counsels' acts were "strategic," the record contains a detailed declaration from respected capital defender David Ruhnke evaluating counsels' performance. Ruhnke's familiarity with the relevant standard of practice cannot fairly be questioned; he has tried more federal capital cases to verdict than any other living lawyer and has taught for years at capital defense trainings nationwide, including in Texas. Ruhnke's declaration alleges specifically and in detail how trial counsels' performance fell below

prevailing standards. ROA.13-70013.v4.875-878;v5.914-918. For example, Ruhnke observes that the record suggests counsel spent too little time preparing, ignored potential challenges to the forensic evidence, failed to conduct a reasonable mitigation investigation, and more. *Id.* Other evidence corroborates Ruhnke's views. Two sentencing witnesses say that counsel did not prepare them. Numerous mitigation witnesses – who could have recounted, *e.g.*, Bernard's remorse for the crime, successful adjustment to confinement, and positive response to structure and supervision when sanctioned as a juvenile – went unidentified due to counsels' deficient investigation. ROA.13-70013.v5.986-989;v6.1379-82;v6.1385-86;v6.1388-89.[2]

On this record, characterizing Bernard's IAC claims as "speculative and conclusory" was clearly erroneous, and denying a hearing was an abuse of discretion. *See Jackson*, 636 F.3d at 692.[3]

---

[2] Further corroborating Ruhnke's declaration are contemporaneous capital defense training materials establishing the contours of an adequate investigation in 1999-2000. ROA.13-70013.v9.179-334

[3] As explained *infra*, no reasonable jurist could dismiss as "cumulative" the varieties of mitigating evidence Bernard's trial counsel failed to develop. Thus, to the extent the District Court refused a hearing on that theory, its assessment was clearly erroneous. *See Jackson*, 636 F.3d at 692.

## C.    The District Court applied an incorrect legal standard.

The District Court refused a hearing because Bernard purportedly could not show "outcome changing prejudice." *E.g.*, GB.20,30,32.    But *Strickland v. Washington*, 466 U.S. 688, 693-94 (1984), expressly rejected such a showing in favor of a "reasonable probability" standard. The District Court's misinterpretation of *Strickland* is not just wrong but "objectively unreasonable," and it abused its discretion in denying a hearing on that basis.    *See Rose v. Lee,* 252 F.3d 676, 689 (4th Cir. 2001) (requiring proof of prejudice by a preponderance of the evidence was "contrary to" *Strickland*); *Moore v. Sec'y Pa. Dep't of Corr.,* 457 F. App'x. 170, 182-83 (3d Cir. 2012) (unpublished) (same); *Trottie v. Stephens*, 720 F.3d 231, 244 n.7 (5th Cir. 2013) (suggesting same).[4]

---

[4] The District Court's erroneous view that Bernard's *Brady* claims were "procedurally defaulted," GB.101, likewise rendered its denial of a hearing an abuse of discretion.  *See* Section IV.D.1.

8

IV.    Bernard's IAC and *Brady* claims each warrant remand for a hearing or, at a minimum, a COA.

    A.    Discovery and a hearing were warranted on Bernard's IAC claim regarding counsels' failure to challenge the source of the fire and its impact on Stacie Bagley's death.

Bernard has alleged that a hearing was necessary to resolve questions about trial counsels' failures to challenge the theory that directly led to his death sentence: that he set the Bagleys' car on fire and that the fire resulted in a tortuous death for Stacie Bagley. BBOB.26-34.

The Government retreats from its position at trial, now implying, *e.g.*, that its arson expert only called it "possible" that the fire started in the passenger area. GB.41-42. But the record shows that the Government highlighted the very theme it now disavows, using leading questions to obtain its preferred responses and then weaving those responses repeatedly into its summation:

- ROA.13-70013.v19.1930 (Government suggests to Brown that "only" Bernard was "positioned…to light the fire");

- ROA.13-70013.v20.2062-63 (repeated questioning of medical examiner regarding opinion that "smoke inhalation" and "thermal injuries" contributed to Stacie Bagley's death, concluding with the

leading question, "Meaning it's possible that some of the thermal injuries could've been sustained …while she was still alive?");

- ROA.13-70013.v20.2084 (leading question to arson investigator, emphasizing his testimony that "the source of the flames is somewhere on the inside in the passenger – in the interior of the vehicle, correct?");

- ROA.13-70013.v20.2086 (leading question to arson investigator, highlighting that it would be "possible" for "someone … standing on this side of the vehicle," where Brown had placed Bernard, to "throw a match" or otherwise "do something [to] … light[] the fire" inside the Bagleys' car);

- ROA.13-70013.v23.2610, lines 10-11 (guilt phase closing: "After [Vialva] shot at them, Brandon Bernard immediately lit the fire. Brandon Bernard is the only person that's in position to light the fire");

- ROA.13-70013.v23.2610, lines 16-17 (guilt phase closing: relying on arson investigator's testimony to argue that the "only person who could have lit the fire was Brandon Bernard" and that

"[w]hen Brandon Bernard lit that fire, Stacie Bagley was still living. She was still alive");

- ROA.13-70013.v23.2610-11 (guilt phase closing: "…Brandon Bernard did not know whether those folks were dead when he lit that fire, and Stacie was not dead");

- ROA.13-70013.v26.3202-03 (penalty phase closing: "Stacie Bagley…was intentionally killed by Brandon Bernard"; "the medical examiner [testified] that Stacie was still living when that fire was set [and] that Stacie continued to live for a period of time after she was shot"; when Bernard "lit that fire, he intentionally did an act that brought about [her] death"; the medical examiner testified that she "die[d] from a gunshot wound and also from the smoke inhalation");

- ROA.13-70013.v26.3269 (penalty phase closing: "Now as to Stacie Bagley, the Government intends [sic] that Brandon Bernard – that the evidence shows that he intentionally killed the victim, Stacie Bagley, 'Yes,' because you now know that's a contributing cause of her death – that you knew from the medical examiner");

11

- ROA.13-70013.v26.3270 (penalty phase closing: "Now, recall when talking about Mr. Bernard, as well, what the evidence is regarding the torture and physical abuse. Recall that he set the fire and burned the bodies…"); and

- ROA.13-70013.v26.3272 (penalty phase closing: "Mr. Bernard set the fire").

We *know* jurors regarded the question of who set the fire, and the degree of Bernard's moral culpability for Stacie Bagley's death as a consequence, as pivotal issues because the jurors asked to review Ms. Bagley's autopsy report as they struggled to reach a sentencing verdict. ROA.13-70013.v2.298, and *supra*, n.1.

Despite the central importance of these issues, Bernard's trial counsel failed to impeach Brown or Lewis with prior statements that raised very significant doubts about whether Bernard set the fire. Lewis had told the Government before trial that Bernard was not in a position to have set the fire, endorsing a diagram that placed Bernard far from the Bagleys' car. ROA.13-70013.v3.594. Brown had told the Government both that Bernard was not in a position to have lit the fire, ROA.13-70013.v3.586, and that Bernard actually *did* light the fire, but

12

did so in a manner at odds with the forensic evidence (*i.e.*, by throwing a match through a closed window), ROA.13-70013.v5.1076;v20.2094. Bernard's counsel left all these matters unaddressed. BBOB.31-33.

Bernard also alleged that counsel failed to challenge the forensic evidence concerning the fire's origin and whether it caused Ms. Bagley to suffer. The Government calls Bernard's argument that testimony from an arson expert would have assisted his defense "purely speculative." GB.43. But Bernard's contention was supported by a detailed declaration from fire expert Gerald Hurst, Ph.D., who explained that "post-flash over burning" made "draw[ing] a scientifically reliable inference about precisely where the fire started" impossible. ROA.13-70013.v9.344. Dr. Hurst also found the physical evidence "just as consistent with the inference that the fire started in the trunk" – where Vialva stood – "[as] with the inference that it started in the passenger compartment," near where Brown testified Bernard had stood. ROA.13-70013.v9.344.

The Government also dismisses as "speculation" Bernard's claim that testimony from a pathologist would have strengthened his defense. GB.44. On this point, Bernard submitted a declaration from Galveston

13

County Chief Medical Examiner Dr. Stephen Pustilnik. In Dr. Pustilnik's view, agonal respiratory effort and agonal circulation, occurring subsequent to Ms. Bagley's death, provided "an equally plausible and more likely explanation" than breathing that occurred while she was alive. ROA.13-70013.v9.349. Consequently, "the fire may not have contributed to Mrs. Bagley's death" at all. ROA.13-70013.v9.349.

The Government insists that "solid medical evidence" shows that Stacie Bagley died "inhal[ing] smoky sooty material." GB.44. But as the record now shows, the Government's scientific evidence was hardly irrefutable. Defense experts could have given at least one juror reason to doubt that Bernard lit the fire or Stacie Bagley suffered as a result. That could have saved Bernard's life.

B.   **Counsel's pretrial negotiations with the DOJ were deficient, and reasonable performance might have produced a different result.**

The Government defends counsel Hunt, Sr.'s feeble efforts to avert a death prosecution, emphasizing that counsel told the DOJ about his list of "at least eighty people" purportedly willing to describe Bernard as a nonviolent follower. GB.29. But in fact, many people on that list did

not know Bernard or lacked any meaningful information about him. ROA.13-70013.v3.610-v4.634. And the list was no substitute for the rich, detailed information that a timely mitigation investigation would have provided.

The District Court found that "death ... would have been authorized for Bernard" in any event. GB.30. That conclusion is mistaken for two reasons. First, it ignores how the jury struggled with Bernard's sentence. *See* Sec. I *supra*. Second, it fails to acknowledge that in other highly aggravated cases, diligent performance by defense counsel has produced a different outcome.

For example, a negotiated plea was ultimately reached in the notorious murder of a locally beloved former student body president at UNC-Chapel Hill.[5] The offense involved extensive aggravating facts, including torture of the victim and post-crime obstruction of justice. Notice of Intent to Seek the Death Penalty, *United States v. Atwater*, No. 1:08CR384-1 (M.D. N.C), Dkt. 22. Moreover, moments before being

---

[5] *See* Sarah Frier, "Death Penalty Dropped for Atwater in Eve Carson Case," The Daily Tar Heel (April 20, 2010) (available at http://www.dailytarheel.com/article/2010/04/death_penalty_dropped_for_atwater_in_eve_carson_case).

shot in the head, the victim begged her killer to pray with her.[6] Nevertheless, a settlement was reached, sparing the defendant. Bernard's comparatively diminished culpability made such an outcome conceivable for him, had counsel performed reasonably.[7]

### C. A reasonable jurist could find Bernard's counsel ineffective for failing to develop and present the wealth of available mitigating evidence.

The Government suggests that Bernard's attorneys' prior experience forecloses a finding of deficient performance. GB.28. Much of the cited experience (*i.e.*, state murder trials where death was not on the table, or non-capital state-court felony trials) was irrelevant here, where the sentencing hearing would likely be the most critical part of the trial. Counsel were also complete strangers to the Federal Death Penalty Act; their only capital experience coming in cases under Texas's capital sentencing statute, which employs completely different procedures. Indeed, counsel Hunt, Sr.'s apparent surprise upon

---

[6] *See* Suzan Clarke, "UNC Student Eve Carson Begged Captors to Pray With Her Before They Killed Her, Says Murder Trial Witness," ABC News (December 14, 2011)(available at http://abcnews.go.com/blogs/headlines/2011/12/unc-student-eve-carson-begged-captors-to-pray-with-her-before-they-killed-her-says-murder-trial-witness/).

[7] This conclusion does not require assuming the same outcome for Vialva, whose execution the Government might well have continued to pursue.

learning that federal courts do not follow Texas' practice of "shuffling" prospective jurors before voir dire, ROA.13-70013.v28.18-19, suggests unfamiliarity with federal practice generally. And experience does not guarantee adequate performance in any event. *See Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006) (finding IAC for failing to investigate mitigation, noting that counsel had tried "quite a few capital cases"); *Hall v. McPherson*, 663 S.E.2d 659, 661 (Ga. 2008) (same; lead counsel was "experienced in death penalty cases"); *Commonwealth v. Collins*, 888 A.2d 564 (Pa. 2005) (same; counsel had defended more than 100 murder cases and six prior capital trials).

### 1. The Government fails to cite, much less distinguish, *Sears v. Upton*, 130 S. Ct. 3259 (2010).

The Government asserts that counsels' decision to delegate key decisions to Bernard's mother was reasonable because Ms. Bernard, "a lieutenant colonel in the United States Army Reserves," was "competent to direct" the mitigation investigation and presentation. GB.50. But nothing about Ms. Bernard's military service prepared her to play that role. More important, the Government's position is squarely foreclosed by *Sears*, a controlling decision the Government pointedly ignores.

17

*Sears* presents a scenario remarkably similar to Bernard's case. Counsel performed a "cursory" mitigation investigation, limited to interviewing "witnesses selected by [Sears's] mother"; the Supreme Court strongly endorsed the conclusion that such an investigation was "on its face … constitutionally inadequate." 130 S. Ct. at 3264. Based on this superficial investigation, Sears's counsel presented seven mitigation witnesses who portrayed Sears's "middle-class background" as "stable, loving, and essentially without incident," and those who knew Sears as "shocked and dismayed" by his crime. *Id.* at 3261-62. Post-conviction investigation revealed a range of other mitigating evidence that an adequate independent investigation would have uncovered. *Id.* at 3262-64.

Bernard's case is indistinguishable. Here, too, counsel confined their investigation *entirely* to the names Ms. Bernard provided, BBOB.37-38, and as a consequence missed a range of critically important potential mitigation, including evidence of cognitive problems and a troubled family background. Bernard's counsel apparently hired Criterion Investigations to pursue the potential witnesses Ms. Bernard identified (their exact role is unknown, since the District Court refused

18

a hearing), but it is undisputed that the defense team focused exclusively on the names provided by Ms. Bernard, rather than performing any independent investigation.

*Contra* GB.47, Bernard's argument is not "that counsel should have hired an investigating agency with more experience in developing mitigation evidence." Criterion Investigations may have been capable of undertaking an appropriately broad and independent mitigation investigation, but Bernard's counsel failed to ensure that such an investigation *was, in fact, conducted.*[8] Even before *Sears*, that was understood to constitute deficient performance. *Walbey v. Quarterman*, 309 F. App'x. 795, 801 (5th Cir. 2009) (unpublished) (counsel ineffective for, *inter alia*, "delegating ... to an expert" the choice of a mitigation defense). Had counsel properly taken the investigatory reins, a wealth of powerful mitigating evidence would have been discovered. BBOB.50-72.

*Sears* also repudiates the Government's view that counsel can make "strategic" decisions without first thoroughly investigating the

---

[8] The Government accuses Bernard of "claim[ing] that the contacts provided by Bernard's mother were insufficient in providing leads." GB.47. Bernard has never denied that at least *some* contacts provided at least *some* important leads. BBOB.36-37. The problem lay with *trial counsel* – who failed to recognize these leads and ensure that they were followed up.

19

defendant's background.  Decisions are not "strategic" if they result from an inadequate investigation that leads to a "haphazard" choice of defense theory, *even if that theory might be reasonable in the abstract.* *Sears*, 130 S. Ct. at 3265 (citing *Wiggins*, 539 U.S. at 522, and *Williams*, 529 U.S. at 396); *see also Walbey*, 309 F. App'x. at 801 (strategic decision-making requires more than "mere possession of *some* information" about the defendant's background).

Here, no evidence supports the Government's claim that counsels' grossly deficient mitigation presentation was "strategic."  The only declarations in the record support Bernard's allegation that no reasonable investigation was performed and that, as a result, counsels' presentation was incomplete, undeveloped, and unpersuasive.  ROA.13-70013.v5.914-950,964-1014.

### 2. The jury knew nothing of the turbulence in Bernard's home environment.

The Government maintains that "many of the claimed omissions [of important facts about Bernard's background] were, in fact, covered at the punishment phase."  GB.48.  This claim distorts the record and misrepresents the meager and confused mitigation case actually presented.

20

For example, the Government asserts that Bernard's mother "discussed her divorce ..., her open-heart surgery, and Bernard's move to his father's residence." GB.48. In actuality, Bernard's mother's testimony was exceedingly brief, covering just eight pages. Nearly three of those pages comprise a rambling expression of her religious beliefs and grief over the victims' fate, rather than any information about Bernard's background. ROA.13-70013.v25.3147-3150. Moreover, the entirety of Ms. Bernard's testimony that "discussed" her divorce, her surgery, and Bernard's move was as follows: "And, then, when [Bernard] came back [to] Temple High, he went to live with his dad then. Because in '92, his dad and I divorced. And then in '92, I had open-heart surgery, and we divorced in September." ROA.13-70013.v25.3151. In other words, Bernard's mother *mentioned* these facts in passing, and defense counsel made *absolutely no* attempt to show how these events affected Bernard. Reasonable counsel would have developed the readily available evidence showing how Bernard's reaction to the turbulence in the family home, exacerbated by depression and isolation, led him into trouble with the law and

21

eventually into the robbery plot that ended with the Bagleys' murder. ROA.13-70013.v5.972-1001.

### 3. No evidence supports the speculation that counsels' failure to investigate or present evidence of Bernard's cognitive impairment was "strategic."

The Government protests that presenting evidence about Bernard's neurocognitive impairment would not have been "congruent" with the "good young man" theory it attributes to counsel. GB.52. On the contrary, such evidence would have helped answer the key question of why Bernard, despite being basically "good," made no effort to stop this horrible crime. This is a question that reasonably effective counsel would have anticipated and attempted to answer. *See* Section III.C.5, *infra*.[9]

### 4. Counsels' failure to develop and present readily available *Skipper* evidence prejudiced Bernard.

Rather than defend trial counsels' failure to investigate evidence of Bernard's successful prior adjustment to supervision and

---

[9] *Martinez v. Dretke*, 404 F.3d 878 (5th Cir. 2005), cited at GB.51, is inapposite. There, a state court affidavit and a live evidentiary hearing in federal court showed that trial counsel fully investigated all options before choosing their mitigation theory. *Martinez*, 404 F.3d at 883, 887-890. Here, by contrast, counsels' investigative failure left them ignorant of the facts pointing to the need for a neuropsychological evaluation. ROA.13-70013.v5.919-922. Moreover, this Court *granted* COA on Martinez's IAC-mitigation claim. 404 F.3d at 887. Bernard's case is at least as COA-worthy.

confinement, *see Skipper v. South Carolina,* 476 U.S. 1 (1986), the Government argues that Bernard suffered no prejudice because Bernard had committed other crimes after being on juvenile probation, and Matthew Mitchell testified that Bernard had found "peace" in jail after being arrested for murder. GB.57.

The Government's first argument is illogical – if a defendant's eventual recidivism rendered moot the mitigating value of his earlier, successful adjustment to supervision or confinement, there would be no basis for many of the cases finding IAC for failure to develop *Skipper* evidence. *See, e.g., Walbey,* 309 F. App'x. at 801 (counsel ineffective for failing to present, *inter alia*, evidence that defendant had "thrived in a structured environment" prior to the capital crime); *Moore v. Johnson,* 194 F.3d 586, 614-622 (5th Cir. 1996), (counsel ineffective for failing, *inter alia*, to develop and present mitigating evidence that defendant had earned early release from a prior prison sentence).

With regard to the Government's second argument, Mitchell's testimony that Bernard said he felt "at peace" in jail was no substitute for the information counsel failed to develop from impartial sources like probation officers and jail records. *See Skipper,* 476 U.S. at 7-8 (jailers'

23

testimony was not "merely cumulative" of testimony from the defendant and his wife describing his good behavior, because jurors would "quite naturally" give "much greater weight" to the testimony of "disinterested witnesses").[10]

### 5. Counsel performed deficiently in making no attempt to account for Bernard's involvement in the crime.

The Government asserts that telling the jury about Bernard's problems as a youth would not have "been in accord" with counsels' purported aim to portray Bernard as "basically good." GB.48. But as reasonably effective capital defense counsel in 1999-2000 understood, an adequate mitigation case must seek to "explain ... why [the] defendant may have acted as he did," and to "connect the dots between … [the] defendant's mental problems, life circumstances, and personal history and [the] crime." *Hooks v. Workman*, 689 F.3d 1148, 1204 (10th Cir. 2012).[11]    Nothing in the current record suggests that counsel

---

[10] Notably, jurors in numerous federal capital cases have imposed life sentences based in part on *Skipper* evidence, even in cases involving multiple murders and other significant aggravating factors, such as *United States v. Dennis*, Crim. No. 3:96CR66-05 (E.D. Va.) (double homicide); *United States v. Jones*, Crim. No. 3:97CR169 (E.D. Va.) (murder during bank robbery; Jones had multiple prior convictions for violent crimes, and had "expressly exhibited" a lack of remorse for the murder).

[11] Nor is *Strickland* prejudice precluded simply because an appropriate investigation could have uncovered some "adverse" evidence. *Sears*, 130 S. Ct. at

24

attempted to connect these dots. The issue warrants further development.

> ### 6. Counsels' failure to seek a limiting instruction concerning Dr. Coons' future dangerousness predictions harmed Bernard.

The record belies the Government's claim that "[t]here was never any doubt that Dr. Coons' testimony related only to Vialva." GB.56. The trial prosecutors effectively communicated the impression that Coons' damaging conclusions applied equally to Bernard. BBOB.58-60. *This Court* even fell prey to that false impression on direct appeal. *United States v. Bernard*, 299 F.3d 467, 482 n.11 (5th Cir. 2002) (invoking Dr. Coons' testimony as a basis for affirming Bernard's death sentence).

> ## D. Denying discovery and an evidentiary hearing on Bernard's *Brady* claims was error.

> ### 1. The Government's attempts to block development of Bernard's *Brady* allegations lack legal support.

The Government contends that (1) Bernard's *Brady* allegations were procedurally defaulted, since the defense supposedly could have

---

3264; *see also Porter v. McCollum*, 558 U.S. 30, 43 (2009) (sentencer would not have dismissed defendant's positive military record simply because a full investigation would also have revealed that he more than once "went AWOL").

found this information on its own (GB.83,99-100), and (2) the withheld information is immaterial because it would be cumulative or inadmissible (GB.63,83-84,90,93,101).

First, Bernard's *Brady* claims rely on evidence that was not part of the trial record because the Government allegedly suppressed it. Bernard cannot therefore be faulted for not presenting them on direct appeal, particularly given that the Government declared an "open file" discovery policy at trial. *See Strickler v. Greene*, 527 U.S. 263, 283 and n.23-24 (1999) (where prosecution has "open file" discovery policy, defendant has "cause" for not having previously challenged the suppression of any exculpatory or mitigating evidence the "open file" omitted); *Banks v. Dretke*, 540 U.S. 668, 691-93 (2004) (same); *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (rejecting procedural default argument in granting COA, stating that where the State has a duty to disclose evidence, the evidence's presence "in the public record … is immaterial" to the procedural default issue).

Even absent an "open file," *Brady* claims are not procedurally defaulted if the information was unavailable at the time of the earlier proceeding. *Graves v. Cockrell*, 351 F.3d 143, 154 (5th Cir. 2003)

26

(granting COA, even though *Brady* claim not raised in state appeal or initial state habeas, because petitioner apparently did not learn of alleged violation until later, and cause for procedural default exists where external factors impeded ability to raise claim earlier).[12]

Thus, *Strickler*, *Banks*, and simple logic all foreclose finding that Bernard's *Brady* claims have been procedurally defaulted. Second, evidence that impeaches a key government witness on an essential issue can rarely be considered cumulative, *Banks*, 540 U.S. at 700-01;BBOB.77 (citing additional cases), and this is not one of those rare cases. The jury struggled to return a death sentence for Bernard, that sentence hinged on Brown's credibility, much of the suppressed impeachment evidence related to Brown, and nothing comparable to it was presented or suggested at trial.

### 2. The specific *Brady* violations require remand for an evidentiary hearing, or at least a COA.

#### a. Impeachment of Terry Brown regarding the source of the fire

Bernard alleged that the Government withheld vital impeachment evidence relating to Brown's explanation about who started the fire that

---

[12] Graves' *Brady* claim ultimately prevailed. *Graves v. Dretke*, 442 F.3d 334, 339 n.3 (5th Cir. 2006).

27

consumed the Bagleys' car. This *Brady* allegation was supported by Terry Brown's attorney's notes of a Governmental debriefing. Those notes reflect that Brown told the Government that Bernard had lit the fire by throwing a match through the car's open window, ROA.13-70013.v5.1076. But the Government's own forensic evidence showed that this window had in fact been closed during the fire. ROA.13-70013.v20.2094. Consequently, Brown's claim that Bernard lit the fire by throwing a match through a window was demonstrably false.

Brown's credibility regarding the source of the fire was a highly consequential fact. The Government relied exclusively on Brown's testimony to argue that Bernard was the "only person" who could have started the fire. The Government also argued that "Stacie Bagley was still living" when the fire was set, that her fiery death amounted to "torture," and that justice demanded that Bernard be condemned to death since he brought about that torture by setting the car on fire. ROA.13-70013.v23.2610-11;v26.3202-03,v26.3269-70; *see* Section IV.A., *supra*.

Despite the fact that Lewis was involved in the actual abduction and both Brown and Lewis participated in dousing the car with lighter

28

fluid, the Government contended that Bernard's having set the fire rendered him more culpable than either Brown or Lewis. Thus, it urged, jurors should reject the statutory mitigating factor that others who might be equally culpable in the Bagleys' deaths were not facing death. ROA.13-70013.v26.3272;BBOB.79.

The Government now asserts that the alleged *Brady* violation concerning the fire's source is immaterial because "Brown stated at trial that he did not see Bernard start that fire," GB.13, and that accordingly "whether there was a prior statement [by Brown] that a match came through a window, or another way, is not material[.]" GB.63,96.

The Government's response fails to recognize the significant impeachment value of Brown's earlier statement. The Government argued to the jury that it should trust Brown's testimony because, although he initially lied, he ultimately decided to tell the truth. ROA.13-70013.v23.2694-2696. But this particular falsehood – and Brown's decision to abandon it – could have persuaded the jury that Brown was simply altering his lies to be sure they conformed to the other evidence. As such, it could have undercut the credibility of *all* of Brown's testimony, and in particular, his testimony about the fire's

29

source. *Cf. Enying Li v. Holder*, — F.3d —, 2013 WL 6851028, at *3 (9th Cir. Dec. 31, 2013) (citing "'long recognized' law that a witness 'deemed unbelievable as to one material fact may be disbelieved in all other respects,' also known by the maxim '*falsus in uno, falsus in omnibus*'"; citation omitted).    Given that impact, Brown's prior statement is indisputably material. *See United States v. Sipes*, 388 F.3d 471, 478 (5th Cir. 2004) (evidence is material if it "would seriously undermine the testimony of a key witness on an essential issue").

The Government's "immateriality" argument lacks credibility in any event, given the inconsistent positions it has taken regarding Brown's testimony. At trial, the Government purposefully led Brown into declaring that Bernard "was the only person who positioned in [sic] this car to light the fire inside the vehicle", ROA.13-70013.v19.1930; it then used Brown's answer as the foundation of its argument for executing Bernard.    ROA.13-70013.v23.2610-11;v26.3202-03;v26.3269-70;v26.3272; *see* Section IV.A., *supra*.    Here, the Government suggests early in its brief that Brown's testimony regarding the source of the fire is immaterial, GB.13, but takes the exact opposite position 30 pages later, declaring Brown's testimony regarding the source of the fire so

30

credible that even expert testimony could not have undermined it. GB.43. The pretzel logic of these irreconcilable arguments underscores the COA-worthiness of Bernard's *Brady* allegations.

### b.    Brown's criminal history

Bernard provided ample evidence that the Government knew Brown had committed several violent acts – including a beating, a shooting, and a shotgun-wielding assault – and hid these facts from defense counsel. ROA.13-70013.v5.1076;BBOB.74.

In open court, the Government led the jury to believe that Brown had no such history. At the guilt phase, it noted that he had a single misdemeanor conviction and no felony convictions. ROA.13-70013.v19.1859-60. At sentencing, it disclosed Brown's involvement in a number of burglaries, but again never suggested any history of violence. ROA.13-70013.v24.2787-2798.

After presenting an inaccurate portrayal of Brown's criminality, the Government argued that Bernard's past acts of stealing bolt cutters and an ATM card made him a "sophisticated career criminal" who lacked a conscience and therefore deserved death. ROA.13-70013.v26.3208;v26.3251;v26.3260-61;v263272-77. This misleading

31

presentation gave the jury a basis for rejecting the statutory mitigating factor that other equally blameworthy individuals would not face death. ROA.13-70013.v2.378; 18 U.S.C. 3592(a)(4).

Despite all this, the Government asks that its failure to disclose Brown's violent past be excused because the evidence would not have been admissible. GB.98.n.18. This argument is incorrect. The evidence would have been admissible to correct the Government's false portrayal of Brown's character. BBOB.78-79 and n.27. It also would have been admissible at sentencing, where the rules of evidence do not apply, 18 U.S.C. 3593(c), to support the mitigating factor that equally culpable individuals were not facing death. That factor requires jurors to evaluate the relative "culpability" of participants in a crime, making evidence of their respective bad acts relevant. Finally, given a hearing, Bernard could show that, had this evidence been disclosed, he would have discovered other admissible evidence as a result.

The Government also contends that full development of this claim should be foreclosed because Bernard failed to show that he could not have discovered "Brown's past criminal activity" with "reasonable diligence." GB.98. This response turns *Brady* on its head. The

32

Government cannot play a game of "the Government can hide and the defendant must seek" when purporting to allow open-file discovery. *Banks*, 540 U.S. at 696. And Bernard, denied a hearing below, had no opportunity to prove his diligence in any event. The Government never suggests what would constitute such diligence. But since the violent acts that Brown admitted to the Government did not result in convictions, the Government presumably believes that Bernard's counsel should have interviewed Brown to unearth them. Yet when Bernard calls trial counsel ineffective for not interviewing Brown, the Government contends that he has failed to prove that such an interview would have been possible. ROA.13-70013.v7.1533. The Government's contradictory positions (Bernard should have interviewed Brown/Bernard could not have interviewed Brown) show yet again that review of this case without further factual development is unfair.

Finally, the Government declares that any *Brady* violation is harmless because the evidence is "cumulative of Brown's criminal gang conduct." GB.13;99. As noted, impeachment evidence of a key government witness can rarely be considered cumulative, BBOB.77, and this evidence was not cumulative because nothing before the jury

33

suggested that Brown had committed other *violent* crimes. Moreover, the Government's actions at trial belie its suggestion that a violent past could be considered cumulative at sentencing, since the Government there argued that Bernard's non-violent criminal past justified executing him.

### c.   Brown's mental illness

Bernard has alleged that the Government suppressed both (1) Brown's mental health evaluation that demonstrated that he would deflect and deny responsibility for his own conduct, and (2) the fact that he was taking psychotropic medications during the crime and the trial, which is evidence that Brown was then suffering from a serious mental illness.

The Government maintains that Bernard has not proven that it possessed this information or that *Brady* compelled its disclosure. GB.99-100.   But in ordering the evaluation, in response to the Government's motion to try Brown as an adult under 18 U.S.C. 5032, the District Court stated that it would disseminate the resulting report

to the appropriate parties.[13]  The Government was a party and has never denied receiving the report.  The very nature of the evaluation, along with the order's wording, makes it likely that the Government received the report, certainly likely enough to require a hearing.

Nor, *contra* GB.100, was the evidence of Brown's mental illness cumulative of "other impeachment evidence."  No other evidence even suggested that Brown suffered from a major mental illness that could distort his perceptions both during the crime *and when he testified*. This evidence thus possesses a "different character" and cannot be deemed cumulative of the offered impeachment evidence.  *See Banks*, 540 U.S. at 702; *United States v. Kohring*, 637 F.3d 895, 904 (9th Cir. 2011) (holding, and describing *Banks* as holding, that suppressed impeachment evidence was not "merely cumulative" where it had "a different character than evidence already known to the defense").

Not only was this evidence not cumulative – its different nature rendered it critically important.  The Government's theory at trial was that Brown had initially lied to investigators but by the time of trial

---

[13] Under Fed. R. Evid. 201, this Court may take judicial notice of that sealed order (filed July 16, 1999, in *United States v. Brown*, Criminal No. W-99-CR-061 (W.D. Tex.)). *See Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998); *Burns v. Mayes*, 369 F. App'x. 526, 527 & n.4 (5th Cir. 2010).  Bernard so requests.

had chosen to tell the truth. A juror could credit that story, because whether a witness lies or tells the truth is within his power to decide. But a mentally-ill witness has no "choice" about whether his active mental illness (or the medications he takes in an attempt to control its symptoms) affects his perceptions, and a juror would understandably be more skeptical of crediting such a witness.

The Government's response questions whether "evidence of medications in Brown's prison records" constituted *Brady* evidence. GB.100. Bernard's claim, however, rests not on "prison records" but on jail records that were in the possession of the United States Marshals Service during the trial. ROA.13-70013.v6.1357-1371. These records support the inference, and a hearing likely would have shown, that the trial prosecutors were aware that Brown was being administered psychotropic drugs throughout the trial. Even if prosecutors were personally unaware, the Marshals Service is part of the DOJ, *see* 28 U.S.C. 561(a), and its knowledge of such administration would have been properly imputed upon them under *Brady* and its progeny. *See United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2001) (imputing to prosecutor the U.S. Marshals Service's knowledge that Government

36

witness failed drug tests); *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995) ("case law indicates that Bureau of Prison files are within the possession and control of the United States Attorney"). And because the Government was obligated to disclose that Brown was on psychotropic medications, that disclosure would likely have led to other discoverable evidence, such as the nature of Brown's major mental illness and the mental health evaluation identified above.

The Government insists that information about Brown's use of other illegal drugs would also have been "cumulative." GB.100. But jurors were ignorant that Brown was taking *psychotropic medications in addition to* illegal drugs. Had that fact been disclosed, the defense could have presented evidence about the synergistic destructive impact of those substances – particularly when coupled with Brown's undisclosed major mental illness – on the accuracy of Brown's perceptions and memory.

A COA should issue for these claims; the Supreme Court has long urged caution in declaring any withheld impeachment evidence to be cumulative, because subtle factors influence jurors' estimation of a witness's truthfulness and reliability. *Napue v. Illinois*, 360 U.S. 264,

37

269 (1959).   And a witness's major mental illness can assume pivotal

importance.   *East v. Johnson*, 123 F.3d 235, 237-240 (5th Cir. 1997)

(reversing death sentence where, due to prosecution's failure to disclose

records, jury was unaware of mental disorders of prosecution's penalty-

phase witness); BBOB.80-81 (collecting cases re: mental illness).

38

## V.    Conclusion

Bernard has advanced specific allegations that directly undermine the Government's theory for why he deserved death.  He also alleged that ineffective assistance of counsel marred all stages of his representation.  All of his claims are supported by uncontested sworn declarations.  Because a reasonable jurist could believe that Bernard's claims warrant further encouragement, this Court should remand this case for an evidentiary hearing.  Alternatively, the Court should grant COAs on all claims.

Respectfully submitted,

*/s Robert C. Owen*
Robert C. Owen, Texas Bar No. 15371950
Bluhm Legal Clinic
Northwestern University School of Law
375 East Chicago Avenue
Chicago, IL  60611
Phone: (312) 503-0135 / Fax: (312) 503-8977
Email:  Robert.Owen@law.northwestern.edu

*/s John R. Carpenter*
John R. Carpenter, Wash. Bar No. 23301
Assistant Federal Public Defender
Western District of Washington
1331 Broadway, Suite 400
Tacoma, Washington  98402
Phone: (253) 593-6710 / Fax: (253) 593-6714
Email:  John_Carpenter@fd.org

39

## CERTIFICATE OF COMPLIANCE

Counsel certifies that:

1.    Exclusive of the portions exempted by 5th Cir. R. 32.2.7(b)(3), this brief contains 6,968 words printed in a proportionally spaced typeface.

2.    This reply brief is printed in a proportionally spaced, serif typeface using Century 14 point font in text and Century 12 point font in footnotes.

3.    Upon request, undersigned counsel will provide an electronic version of this reply brief and/or copy of the word printout to the Court.

4.    Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Cir. R. 32.2.7, may result in the Court's striking this reply brief and imposing sanctions against the person who signed it.

/s John R. Carpenter
John R. Carpenter, Wash. Bar No. 23301
Assistant Federal Public Defender
Western District of Washington
1331 Broadway, Suite 400
Tacoma, Washington  98402
Phone: (253) 593-6710 / Fax: (253) 593-6714
Email:  John_Carpenter@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2014, I electronically filed the foregoing Defendant-Appellant Brandon Bernard's Corrected Reply Brief in Support of Application for Certificate of Appealability with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s *John R. Carpenter*
John R. Carpenter, Wash. Bar No. 23301
Assistant Federal Public Defender
Western District of Washington
1331 Broadway, Suite 400
Tacoma, Washington  98402
Phone: (253) 593-6710 / Fax: (253) 593-6714
Email:  John_Carpenter@fd.org

41